# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 15, 2018

Lyle W. Cayce
Clerk

————

No. 17-10238

————

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
FINANCIAL SERVICES INSTITUTE, INCORPORATED; FINANCIAL
SERVICES ROUNDTABLE; GREATER IRVING-LAS COLINAS CHAMBER
OF COMMERCE; HUMBLE AREA CHAMBER OF COMMERCE, doing
business as Lake Houston Chamber of Commerce; INSURED RETIREMENT
INSTITUTE; LUBBOCK CHAMBER OF COMMERCE; SECURITIES
INDUSTRY AND FINANCIAL MARKETS ASSOCIATION; TEXAS
ASSOCIATION OF BUSINESS,

> Plaintiffs - Appellants

> v.

UNITED STATES DEPARTMENT OF LABOR; R. ALEXANDER ACOSTA,
SECRETARY, U.S. DEPARTMENT OF LABOR,

> Defendants - Appellees

-------------------------------------------------------------------------

AMERICAN COUNCIL OF LIFE INSURERS; NATIONAL ASSOCIATION
OF INSURANCE AND FINANCIAL ADVISORS; NATIONAL
ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS - TEXAS;
NATIONAL ASSOCIATION OF INSURANCE AND FINANCIAL
ADVISORS - AMARILLO; NATIONAL ASSOCIATION OF INSURANCE
AND FINANCIAL ADVISORS - DALLAS; NATIONAL ASSOCIATION OF
INSURANCE AND FINANCIAL ADVISORS - FORT WORTH; NATIONAL
ASSOCIATION OF INSURANCE AND FINANCIAL ADVISORS - GREAT
SOUTHWEST; NATIONAL ASSOCIATION OF INSURANCE AND
FINANCIAL ADVISORS - WICHITA FALLS;

> Plaintiffs - Appellants

No. 17-10238

v.

UNITED STATES DEPARTMENT OF LABOR; R. ALEXANDER ACOSTA, SECRETARY, U.S. DEPARTMENT OF LABOR,

          Defendants - Appellees

-------------------------------------------------------------------------

INDEXED ANNUITY LEADERSHIP COUNCIL; LIFE INSURANCE COMPANY OF THE SOUTHWEST; AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY; MIDLAND NATIONAL LIFE INSURANCE COMPANY; NORTH AMERICAN COMPANY FOR LIFE AND HEALTH INSURANCE,

          Plaintiffs - Appellants

v.

R. ALEXANDER ACOSTA, SECRETARY, U.S. DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF LABOR,

          Defendants - Appellees

───────────────

Appeals from the United States District Court
for the Northern District of Texas

───────────────

Before STEWART, Chief Judge, and JONES and CLEMENT, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Three business groups[1] filed suits challenging the "Fiduciary Rule" promulgated by the Department of Labor (DOL) in April 2016. The Fiduciary Rule is a package of seven different rules that broadly reinterpret the term

---

[1] Suits were separately filed by groups headed by the U.S. Chamber of Commerce, the American Council of Life Insurers, and the Indexed Annuity Leadership Council. The suits were consolidated and jointly decided by the district court in the Northern District of Texas.

No. 17-10238

"investment advice fiduciary" and redefine exemptions to provisions concerning fiduciaries that appear in the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 (ERISA), codified as amended at 29 U.S.C. § 1001 et seq, and the Internal Revenue Code, 26 U.S.C. § 4975. The stated purpose of the new rules is to regulate in an entirely new way hundreds of thousands of financial service providers and insurance companies in the trillion dollar markets for ERISA plans and individual retirement accounts (IRAs). The business groups' challenge proceeds on multiple grounds, including (a) the Rule's inconsistency with the governing statutes, (b) DOL's overreaching to regulate services and providers beyond its authority, (c) DOL's imposition of legally unauthorized contract terms to enforce the new regulations, (d) First Amendment violations, and (e) the Rule's arbitrary and capricious treatment of variable and fixed indexed annuities.

The district court rejected all of these challenges. Finding merit in several of these objections, we VACATE the Rule.

## I. BACKGROUND

As might be expected by a Rule that fundamentally transforms over fifty years of settled and hitherto legal practices in a large swath of the financial services and insurance industries, a full explanation of the relevant background is required to focus the legal issues raised here.

Congress passed ERISA in 1974 as a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). Title I of ERISA confers on the DOL far-reaching regulatory authority over employer- or union-sponsored retirement and welfare benefit plans. 29 U.S.C. §§ 1108(a)-(b), 1135. A "fiduciary" to a Title I plan is subject to duties of loyalty and prudence. 29 U.S.C. § 1104(a)(1)(A)-(B). Fiduciaries may not engage in several "prohibited transactions," including transactions in which the fiduciary

3

No. 17-10238

receives a commission paid by a third party or compensation that varies based on the advice provided.  29 U.S.C. § 1106(b)(3).  ERISA authorizes lawsuits by the DOL, plan participants or beneficiaries against fiduciaries to enforce these duties.  29 U.S.C. § 1132(a).

ERISA Title II created tax-deferred personal IRAs and similar accounts within the Internal Revenue Code.  26 U.S.C. § 4975(e)(1)(B).[2]  Title II did not authorize DOL to supervise financial service providers to IRAs in parallel with its power over ERISA plans.  Moreover, fiduciaries to IRAs are not, unlike ERISA plan fiduciaries, subject to statutory duties of loyalty and prudence. Instead, Title II authorized the Treasury Department, through the IRS, to impose an excise tax on "prohibited [*i.e.* conflicted] transactions" involving fiduciaries of both ERISA retirement plans and IRAs. 26 U.S.C. § 4975 (a), (b), (f)(8)(E).  DOL was authorized only to grant exemptions from the prohibited transactions provision, 29 U.S.C. § 1108(a), 26 U.S.C. § 4975(c)(2), and to "define accounting, technical and trade terms" that appear in both laws, 29 U.S.C. § 1135.  Title II did not create a federal right of action for IRA owners, but state law and other remedies remain available to those investors.

The critical term "fiduciary" is defined alike in both Title I, 29 U.S.C. § 1002(21)(A), and Title II, 26 U.S.C. § 4975(e)(3).  In Title I, fiduciaries are subject to comprehensive DOL regulation, while in Title II individual plans, they are subject to the prohibited transactions provisions.  The provision states that "a person is a fiduciary with respect to a plan to the extent he

- exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," 29 U.S.C. § 1002(21)(A)(i);

---

[2] Title II also covers individual retirement annuities, health savings accounts, and certain other tax-favored trusts and plans.  *See* 26 U.S.C. § 4975(e)(1)(C)-(F).   For convenience, all such plans are designated "IRAs" in this opinion.

No. 17-10238

- "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so," 29 U.S.C. § 1002(21)(A)(ii); or

- "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(iii).

Subsection ii of the "fiduciary" definition is in issue here.

In 1975, DOL promulgated a five-part conjunctive test for determining who is a fiduciary under the investment-advice subsection. Under that test, an investment-advice fiduciary is a person who (1) "renders advice…or makes recommendation[s] as to the advisability of investing in, purchasing, or selling securities or other property;" (2) "on a regular basis;" (3) "pursuant to a mutual agreement…between such person and the plan;" and the advice (4) "serve[s] as a primary basis for investment decisions with respect to plan assets;" and (5) is "individualized . . . based on the particular needs of the plan." 29 C.F.R. § 2510.3-21(c)(1) (2015).

The 1975 regulation captured the essence of a fiduciary relationship known to the common law as a special relationship of trust and confidence between the fiduciary and his client. *See*, *e.g.*, GEORGE TAYLOR BOGERT, ET AL., TRUSTS & TRUSTEES § 481 (2016 update). The regulation also echoed the then thirty-five-year old distinction drawn between an "investment adviser," who is a fiduciary regulated under the Investment Advisers Act, and a "broker or dealer" whose advice is "solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." 15 U.S.C. § 80b-2(a)(11)(C). Thus, the DOL's original regulation specified that a fiduciary relationship would exist only if, *inter alia*, the adviser's services were

5

furnished "regularly" and were the "primary basis" for the client's investment decisions.  29 C.F.R. § 2510.3-21(c)(1) (2015).

In the decades following the passage of ERISA, the use of participant-directed IRA plans has mushroomed as a vehicle for retirement savings. Additionally, as members of the baby-boom generation retire, their ERISA plan accounts will roll over into IRAs.  Yet individual investors, according to DOL, lack the sophistication and understanding of the financial marketplace possessed by investment professionals who manage ERISA employer-sponsored plans.  Further, individuals may be persuaded to engage in transactions not in their best interests because advisers like brokers and dealers and insurance professionals, who sell products to them, have "conflicts of interest."  DOL concluded that the regulation of those providing investment options and services to IRA holders is insufficient.  One reason for this deficiency is the governing statutory architecture:

> Although ERISA's statutory fiduciary obligations of prudence and loyalty do not govern the fiduciaries of IRAs and other plans not covered by ERISA, these fiduciaries are subject to prohibited transaction rules under the [Internal Revenue] Code.  The statutory exemptions in the Code apply and the [DOL] has been given the statutory authority to grant administrative exemptions under the Code. [footnote omitted] In this context, however, the sole statutory sanction for engaging in the illegal transactions is the assessment of an excise tax enforced by the [IRS].

Definition of Fiduciary, 81 Fed. Reg. at 20946, 20953 (Apr. 8, 2015) (to be codified at 29 C.F.R. pts. 2509, 2510, 2550).

A second reason for the gap lies in the terms of the 1975 regulation's definition of an investment advice fiduciary.  In particular, by requiring that the advice be given to the customer on a "regular basis" and that it must also be the "primary basis" for investment decisions, the definition excluded one-time transactions like IRA rollovers.  As DOL saw it, the term "adviser" should

extend well beyond investment advisers registered under the Investment Advisers Act of 1940 or under state law. Semantically, the term "investment advice fiduciary" can include "an individual or entity who is, among other things, a representative of a registered investment adviser, a bank or similar financial institution, an insurance company, or a broker-dealer." 81 Fed. Reg. at 20946 n.1. Further, "[u]nless they are fiduciaries, . . . these consultants and advisers are free under ERISA and the Code, not only to receive such conflicted compensation, but also to act on their conflicts of interest to the detriment of their customers." 81 Fed. Reg. at 20956.

Beginning in 2010, DOL set out to fill the perceived gap. The result, announced in April 2016, was an overhaul of the investment advice fiduciary definition, together with amendments to six existing exemptions and two new exemptions to the prohibited transaction provision in both ERISA and the Code (collectively, as previously noted, the Fiduciary Rule). The Fiduciary Rule is of monumental significance to the financial services and insurance sectors of the economy. The package of regulations and accompanying explanations, although full of repetition, runs 275 pages in the Federal Register. DOL estimates that compliance costs imposed on the regulated parties might amount to $31.5 billion over ten years with a "primary estimate" of $16.1 billion. 81 Fed. Reg. at 20951. In a novel assertion of DOL's power, the Fiduciary Rule directly disadvantages the market for fixed indexed annuities in comparison with competing annuity products. Finally, with unintentional irony, DOL pledged to alleviate the regulated parties' concerns about "compliance and interpretive issues" following this "issuance of highly technical or significant guidance" by drawing attention to its "broad assistance for regulated parties on the Affordable Care Act regulations . . . ." 81 Fed. Reg. at 20947.

No. 17-10238

## II. THE FIDUCIARY RULE

Now to the relevant highlights of the Fiduciary Rule.[3] In lieu of the 1975 definition of an investment advice fiduciary, the Fiduciary Rule provides that an individual "renders investment advice for a fee" whenever he is compensated in connection with a "recommendation as to the advisability of" buying, selling, or managing "investment property." 29 C.F.R. § 2510.3-21(a)(1) (2017). A fiduciary duty arises, moreover, when the "investment advice" is directed "to a specific advice recipient . . . regarding the advisability of a particular investment or management decision with respect to" the recipient's investment property. 29 C.F.R. § 2510.3-21(a)(2)(iii) (2017).

To be sure, the new rule purports to withdraw from fiduciary status communications that are not "recommendations," *i.e.*, those in which the "content, context, and presentation" would not objectively be viewed as "a suggestion that the advice recipient engage in or refrain from taking a particular course of action." 29 C.F.R. § 2510.3-21(b)(1) (2017). But the more individually tailored the recommendation is, the more likely it will render the "adviser" a fiduciary. *Id.*

Critically, the new definition dispenses with the "regular basis" and "primary basis" criteria used in the regulation for the past forty years. Consequently, it encompasses virtually all financial and insurance professionals who do business with ERISA plans and IRA holders. Stockbrokers and insurance salespeople, for instance, are exposed to regulations including the prohibited transaction rules. The newcomers are thus barred, without an exemption, from being paid whatever transaction-

---

[3] The original definition of an investment advice fiduciary occupied one page in the Federal Register. Definition of the Term "Fiduciary," 40 Fed. Reg. 50842, 50842-43 (Oct. 31, 1975). The revised definition is over five pages long, and the associated exemption rules are complex. The issues raised here can, however, be addressed by paraphrasing the critical language of the regulations, as all parties have done.

based commissions and brokerage fees have been standard in their industry segments because those types of compensation are now deemed a conflict of interest.

The second novel component of the Fiduciary Rule is a "Best Interest Contract Exemption," (BICE) which, if adopted by "investment advice fiduciaries," allows them to avoid prohibited transactions penalties. 81 Fed. Reg. 21002 (Apr. 8, 2016), *corrected at* 81 Fed. Reg. 44773 (July 11, 2016), *and amended by* 82 Fed. Reg. 16902 (Apr. 7, 2017). The BICE and related exemptions were promulgated pursuant to DOL's authority to approve prohibited transaction exemptions (PTE's) for certain classes of fiduciaries or transactions. 29 U.S.C. § 1108(a), 26 U.S.C. § 4975(c)(2).[4] The BICE was intended to afford such relief because, as DOL candidly acknowledged, the new standard could "sweep in some relationships that are not appropriately regarded as fiduciary in nature and that the Department does not believe Congress intended to cover as fiduciary relationships." 81 Fed. Reg. at 20948.

The BICE supplants former exemptions with a web of duties and legal vulnerabilities. To qualify for a BIC Exemption, providers of financial and insurance services must enter into contracts with clients that, *inter alia,* affirm their fiduciary status; incorporate "Impartial Conduct Standards" that include the duties of loyalty and prudence; "avoid[] misleading statements;" and charge no more than "reasonable compensation." As noted above, Title II service providers to IRA clients are not statutorily required to abide by duties of loyalty and prudence. Yet, to qualify as *not* being "investment advice fiduciaries" per the new definition, the financial service providers must deem

---

[4] Exemptions can be "conditional" or "unconditional," but they must be "(1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of such plan." 29 U.S.C. § 1108(a); 26 U.S.C. § 4975(c)(2).

themselves fiduciaries to their clients. In addition, the contracts may not include exculpatory clauses such as a liquidated damages provision nor may they require class action waivers. DOL contends that the enforceability of the BICE-created contract, "and the potential for liability" it offers, were "central goals of this regulatory project." 81 Fed. Reg. at 21021, 21033. In these respects, a BIC Exemption comes at a high price.[5]

The third relevant element of the Fiduciary Rule is the amended Prohibited Transaction Exemption 84-24. Since 1977, that exemption had covered transactions involving insurance and annuity contracts and permitted customary sales commissions where the terms were at least as favorable as those at arm's-length, provided for "reasonable" compensation, and included certain disclosures. 49 Fed. Reg. 13208, 13211 (Apr. 3, 1984); *see* 42 Fed. Reg. 32395, (June 24, 1977) (precursor to PTE 84-24). As amended in the Fiduciary Rule package, PTE 84-24 now subjects these transactions to the same Impartial Conduct Standards as in the BICE exemption. 81 Fed. Reg. 21147 (Apr. 8, 2016), *corrected at* 81 Fed. Reg. 44786 (July 11, 2015), *and amended by* 82 Fed. Reg. 16902 (Apr. 7, 2017). But DOL removed fixed indexed annuities from the more latitudinarian PTE 84-24, leaving only fixed-rate annuities within its scope. In practice, this action places a disproportionate burden on the market for fixed indexed annuities, as opposed to competing annuity products.

---

[5] DOL also created a new Class Exemption for Principal Transactions in Certain Assets Between Investment Advice Fiduciaries and Employee Benefit Plans and IRAs that is "functionally identical" to the BICE and allows financial institutions to engage in otherwise-prohibited transactions while receiving compensation. 81 Fed. Reg. 21089 (Apr. 8, 2016), *corrected at* 81 Fed. Reg. 44784 (July 11, 2016), *and amended by* 82 Fed. Reg. 16902 (Apr. 7, 2017). As the parties recommended, our discussion treats these provisions alike by referencing BICE alone for convenience.

The President has directed DOL to reexamine the Fiduciary Rule and "prepare an updated economic and legal analysis" of its provisions, 82 Fed. Reg. 9675 (Feb. 3, 2017), and the effective date of some provisions has been extended to July 1, 2019. The case, however, is not moot. The Fiduciary Rule has already spawned significant market consequences, including the withdrawal of several major companies, including Metlife, AIG and Merrill Lynch from some segments of the brokerage and retirement investor market. Companies like Edward Jones and State Farm have limited the investment products that can be sold to retirement investors. Confusion abounds—how, for instance, does a company wishing to comply with the BICE exemption document and prove that its salesman fostered the "best interests" of the individual retirement investor client? The technological costs and difficulty of compliance compound the inherent complexity of the new regulations. Throughout the financial services industry, thousands of brokers and insurance agents who deal with IRA investors must either forgo commission-based transactions and move to fees for account management or accept the burdensome regulations and heightened lawsuit exposure required by the BICE contract provisions. It is likely that many financial service providers will exit the market for retirement investors rather than accept the new regulatory regime.

Further, as DOL itself recognized, millions of IRA investors with small accounts prefer commission-based fees because they engage in few annual trading transactions. Yet these are the investors potentially deprived of all investment advice as a result of the Fiduciary Rule, because they cannot afford to pay account management fees, or brokerage and insurance firms cannot afford to service small accounts, given the regulatory burdens, for management fees alone.

11

No. 17-10238

The district court rejected all of the appellants' challenges to the Fiduciary Rule. Timely appeals were filed.

### III. DISCUSSION

Appellants pose a series of legal issues, all of which are reviewed de novo on appeal, *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000), and nearly all of which we must address. The principal question is whether the new definition of an investment advice fiduciary comports with ERISA Titles I and II. Alternatively, is the new definition "reasonable" under *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) and not violative of the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A) (2016)?

Beyond that threshold are the questions whether the BICE exemption, including its impact on fixed indexed annuities, asserts affirmative regulatory power inconsistent with the bifurcated structure of Titles I and II and is invalid under the APA. Further, are the required BICE contractual provisions consistent with federal law in creating implied private rights of action and prohibiting certain waivers of arbitration rights?[6]

### A.  The Fiduciary Rule Conflicts with the Text of 29 U.S.C. Sec. 1002(21)(A)(ii); 26 U.S.C. Sec. 4975(e)(3)(B).

DOL expanded the statutory term "fiduciary" by redefining one out of three provisions explaining the scope of fiduciary responsibility under ERISA and the Internal Revenue Code. The second of these three provisions states that

> a person is a fiduciary with respect to a plan to the extent . . . he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so[.]

---

[6] Given these other grounds for rejecting the Fiduciary Rule, and consistent with principle of constitutional avoidance, we need not address the First Amendment issue raised by one of the appellants.

No. 17-10238

29 U.S.C. § 1002(21)(A)(ii); 26 U.S.C. § 4975(e)(3)(B).  For the past forty years, DOL has considered the hallmarks of an "investment advice" fiduciary's business to be its "regular" work on behalf of a client and the client's reliance on that advice as the "primary basis" for her investment decisions.  29 C.F.R. § 2510.3-21(c)(1) (2015).  The Fiduciary Rule's expanded coverage is best explained by variations of the following hypothetical advanced by the Chamber of Commerce: a broker-dealer otherwise unrelated to an IRA owner tells the IRA owner, "You'll love the return on X stock in your retirement plan, let me tell you about it" (the "investment advice"); the IRA owner purchases X stock; and the broker-dealer is paid a commission (the "fee or other compensation").  Based on this single sales transaction, as DOL agrees, the broker-dealer has now been brought within the Fiduciary Rule.  The same consequence follows for insurance agents who promote annuity products.

Expanding the scope of DOL regulation in vast and novel ways is valid only if it is authorized by ERISA Titles I and II.  A regulator's authority is constrained by the authority that Congress delegated it by statute.  Where the text and structure of a statute unambiguously foreclose an agency's statutory interpretation, the intent of Congress is clear, and "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43.  To decide whether the statute is sufficiently capacious to include the Fiduciary Rule, we rely on the conventional standards of statutory interpretation and authoritative Supreme Court decisions.  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013) (quoting *Chevron*, 467 U.S. at 842-43).  The text, structure, and the overall statutory scheme are among the pertinent "traditional tools of statutory construction."  *See Chevron,* 467 U.S. at 843 n.9.

No. 17-10238

We conclude that DOL's interpretation of an "investment advice fiduciary" relies too narrowly on a purely semantic construction of one isolated provision and wrongly presupposes that the provision is inherently ambiguous. Properly construed, the statutory text is not ambiguous. Ambiguity, to the contrary, "is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner,* 513 U.S. 115, 118 (1994). Moreover, all relevant sources indicate that Congress codified the touchstone of common law fiduciary status—the parties' underlying relationship of trust and confidence—and nothing in the statute "requires" departing from the touchstone. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 311 (1992) (where a term in ERISA has a "settled meaning under … the common law, a court *must* infer, unless the statute otherwise *dictates*, that Congress mean[t] to incorporate the established meaning") (internal quotation omitted) (emphasis added).

### 1.    The Common Law Presumptively Applies

Congress's use of the word "fiduciary" triggers the "settled principle of interpretation that, absent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'" *United States v. Castleman*, 134 S. Ct. 1405, 1410 (2014) (quoting *Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013)). Indeed, it is "the general rule that 'a common-law term of art should be given its established common-law meaning,' except 'where that meaning does not fit.'" *Id.* (quoting *Johnson v. United States*, 559 U.S. 133, 139 (2010)). This general presumption is particularly salient in analyses of ERISA, which has its roots in the common law. *See, e.g., Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) ("In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts."); *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 294–96 (2009); *Aetna Health Inc. v. Davila,* 542 U.S. 200, 218–19 (2004); *Pegram v. Herdrich*,

14

No. 17-10238

530 U.S. 211, 223–24 (2000); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989).

The common law term "fiduciary" falls within the scope of this presumption. In *Firestone Tire & Rubber Co. v. Bruch,* the Supreme Court cited Congress's use of "fiduciary" as one example of "ERISA abound[ing] with the language and terminology of trust law."   489 U.S. at 110 (citing 29 U.S.C. § 1002(21)(A)).   More importantly for present purposes, the Court rejected dictionary definitions in favor of the common law when analyzing the statutory definition of "fiduciary" in *Varity Corp. v. Howe*, 516 U.S. 489 (1996).   There, the Court was tasked with determining the meaning of the word "administration," which appears in another of the tripartite examples of a "fiduciary," 29 U.S.C. § 1002(21)(A)(iii).  *See Varity Corp.*, 516 U.S. at 502.  The Court noted that "[t]he dissent look[ed] to the dictionary for interpretive assistance," but the Court expressly declined to follow that route: "Though dictionaries sometimes help in such matters, we believe it more important here to look to the common law, which, over the years, has given to terms such as 'fiduciary' and trust 'administration' a legal meaning to which, we normally presume, Congress meant to refer."   *Id.*   The Court then considered the "ordinary trust law understanding of fiduciary 'administration'" to determine that an entity "was acting as a fiduciary."  *Id.* at 502–03.

The common law understanding of fiduciary status is not only the proper starting point in this analysis, but is as specific as it is venerable.   Fiduciary status turns on the existence of a relationship of trust and confidence between the fiduciary and client.  "The concept of fiduciary responsibility dates back to fiducia of Roman law," and "[t]he entire concept was founded on concepts of sanctity, trust, confidence, honesty, fidelity, and integrity."  George M. Turner, *Revocable Trusts* § 3:2 (Sept. 2016 Update).  Indeed, "[t]he development of the term in legal history under the Common Law suggested a situation wherein a

15

person assumed the character of a trustee, or an analogous relationship, where there was an underlying confidence involved that required scrupulous fidelity and honesty." *Id.* Another treatise addresses relationships "which require trust and confidence," and explains that "[e]quity has always taken an active interest in fostering and protecting these intimate relationships which it calls 'fiduciary.'" GEORGE G. BOGERT, ET AL., TRUSTS & TRUSTEES § 481 (2017 Update). Yet another treatise describes fiduciaries as "individuals or corporations who appear to accept, expressly or impliedly, an obligation to act in a position of trust or confidence for the benefit of another or who have accepted a status or relationship understood to entail such an obligation, generating the beneficiary's justifiable expectations of loyalty." 3 DAN B. DOBBS, ET AL., THE LAW OF TORTS § 697 (2d ed. June 2017 Update). Notably, DOL does not dispute that a relationship of trust and confidence is the *sine qua non* of fiduciary status.

Congress did not expressly state the common law understanding of "fiduciary," but it provided a good indicator of its intention. In § 1002, ERISA's definitional section, 41 of 42 provisions begin by stating, "[t]he term ["X"] means . . . ." 29 U.S.C. § 1002(1)–(20), (22)–(42). For example, § 1002(6) begins, "[t]he term 'employee' means any individual employed by an employer."[7] Similarly, § 1002(8) begins, "[t]he term 'beneficiary' means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." In each case, Congress placed a word or phrase in quotation marks before defining the word or phrase.

The unique provision in which Congress did not take that route delineates the term "fiduciary." Instead, Congress stated that "a person is a

---

[7] In *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. at 322-23, the Supreme Court invoked the common law to interpret ERISA's definition of "employee."

fiduciary with respect to a plan to the extent" he performs any of the enumerated functions. *Id.* § 1002(21)(A). That Congress did not place "fiduciary" in quotation marks indicates Congress's decision that the common law meaning was self-explanatory, and it accordingly addressed fiduciary status for ERISA purposes in terms of enumerated functions. *See John Hancock Mut. Life Ins. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96–97 (1993) (the words "to the extent" in ERISA are "words of limitation").

In any event, "absent other indication, 'Congress intend[ed] to incorporate the well-settled meaning'" of "fiduciary"—the very essence of which is a relationship of trust and confidence. *See Castleman*, 134 S. Ct. at 1410 (quoting *Sekhar*, 133 S. Ct. at 2724).

### 2.    Displacement of the Presumption?

DOL concedes the relevance of the common-law presumption and the common-law trust-and-confidence standard but then places all its eggs in one basket: displacement of the presumption. Invoking its favorite phrases from *Varity Corp.*, DOL argues that the common law is only "a starting point" and the presumption "is displaced if inconsistent with 'the language of the statute, its structure, or its purposes.'" (quoting *Varity Corp.*, 516 U.S. at 497) (emphasis removed). Displacement should occur here, DOL continues, because "DOL reasonably interpreted ERISA's language, structure, and purpose to go beyond the trust-and-confidence standard."

As a preliminary matter, DOL neglects to mention two aspects of *Varity Corp.* that cut against its position. First, the phrase quoted above is significantly less absolute than DOL lets on: "In *some instances*, trust law will offer only a starting point, after which courts must go on to ask *whether*, or *to what extent*, the language of the statute, its structure, or its purposes *require* departing from common-law trust requirements." *Varity Corp.*, 516 U.S. at 497 (emphases added). Thus, it is not the case, as DOL suggests, that any

17

perceived inconsistency automatically requires jettisoning the common-law understanding of "fiduciary." Second, although the Court suggested that in some instances the common law will be "only a starting point," the Court went on specifically to reject reliance on dictionary definitions when interpreting the statutory definition of "fiduciary" and reverted to the common law. *See id.* at 502–03. Thus, *Varity Corp.* reinforces rather than rejects the common law when interpreting ERISA.

Even more important, DOL acknowledges appellants' argument "that there is nothing inherently inconsistent between the trust-and-confidence standard and ERISA's definition" of "fiduciary." The DOL's only response is that it "is not required to adopt semantically possible interpretations merely because they would comport with common-law standards." But this proves appellants' point: adopting "semantically possible" interpretations that *do not* "comport with common law standards" is contrary to *Varity Corp.* because the statute does not "require departing from [the] common-law" trust-and-confidence standard. *Id.* at 497. DOL's concession should end any debate about the viability and vitality of the common law presumption.

### 3. Statutory Text—"investment advice fiduciary"

Even if the common law presumption did not apply, the Fiduciary Rule contradicts the text of the "investment advice fiduciary" provision and contemporary understandings of its language. To restate, a person is a fiduciary with respect to a plan to the extent "he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so[.]" 29 U.S.C. § 1002(21)(A)(ii); 26 U.S.C. § 4975(e)(3)(B). Focusing on the words "investment" and "advice," DOL cites dictionary definitions to explain the breadth of the terms, the reasonableness of the Fiduciary Rule's construction

of those terms, and the permissibility of its departure from the common law trust and confidence standard.

Going straight to dictionary definitions not only conflicts with *Varity Corp.*, but it also fails to take into account whether the words that Congress used were terms of art within the financial services industry. *See, e.g., Corning Glass Works v. Brennan*, 417 U.S. 188, 201–02 (1974) (rejecting an ordinary understanding of "working conditions" because "the term has a different and much more specific meaning in the language of industrial relations"). Moreover, the technique of defining individual words in a vacuum fails to view the entire provision in context. "[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).

Properly considered, the statutory text equating the "rendering" of "investment advice for a fee" with fiduciary status comports with common law and the structure of the financial services industry. When enacting ERISA, Congress was well aware of the distinction, explained further below, between investment advisers, who were considered fiduciaries, and stockbrokers and insurance agents, who generally assumed no such status in selling products to their clients. The Fiduciary Rule improperly dispenses with this distinction. Had Congress intended to include as a fiduciary any financial services provider to investment plans, it could have written ERISA to cover any person who renders "*any* investment advice for a fee...." The word "any" would have embodied DOL's expansive interpretation, and it is a word used five times in ERISA's tripartite fiduciary definition, *e.g.* "*any* authority or responsibility." *See generally* 29 U.S.C. § 1002(21)(A). That Congress did not say "*any* investment advice" signals the intentional omission of this adjective. *See*

*Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another. . ., it is presumed that Congress acts intentionally and purposely. . . ."). Further, DOL's interpretation conjoins "advice" with a "fee or other compensation, direct or indirect," but it ignores the preposition "for," which indicates that the purpose of the fee is not "sales" but "advice." Therefore, taken at face value, the provision rejects "*any* advice" in favor of the activity of "render[ing] investment advice for a fee." Stockbrokers and insurance agents are compensated only for completed sales ("directly or indirectly"), not on the basis of their pitch to the client. Investment advisers, on the other hand, are paid fees because they "render advice." The statutory language preserves this important distinction.

Put otherwise, DOL's defense of the Fiduciary Rule contemplates a hypothetical law that states, "a person is a fiduciary with respect to a plan to the extent…he receives a fee, in whole or in part, in connection with any investment advice…." This language could have embraced individual sales transactions as well as the stand-alone furnishing of investment advice. But this iteration does not square with the last clause of the actual law, which includes a person who "has any authority or responsibility to [render investment advice]." Only in DOL's semantically created world do salespeople and insurance brokers have "authority" or "responsibility" to "render investment advice." The DOL interpretation, in sum, attempts to rewrite the law that is the sole source of its authority. This it cannot do.

Further, in law and the financial services industry, rendering "investment advice for a fee" customarily distinguished salespeople from investment advisers during the period leading up to ERISA's 1974 passage. Congress is presumed to have acted against a background of shared understanding of the terms it uses in statutes. *Morissette v. United States*,

342 U.S. 246, 263 (1952); *see also Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."). And the phrase "investment advice for a fee" and similar phrases generally referenced a fiduciary relationship of trust and confidence between the adviser and client.

To begin with, DOL itself reflected this understanding in its 1975 definition of an "investment advice fiduciary." There, DOL there explained that a "fee or other compensation" for the rendering of investment advice under ERISA "should be deemed to include all fees or other compensation incident to the transaction in which the investment advice to the plan has been rendered or will be rendered." Definition of the Term "Fiduciary," 40 Fed. Reg. 50842, 50842-43 (Oct. 31, 1975). DOL went on to say that this "may include" brokerage commissions, but only if the broker-dealer who earned the commission otherwise satisfied the regulation's requirements that the broker-dealer provide individualized advice on a regular basis pursuant to a mutual agreement with his client. *See id.* Later, DOL reiterated that "the receipt of commissions by a broker-dealer which performs services in addition to that of effecting or executing securities transactions for a plan is not necessarily dispositive of whether the broker-dealer received a portion of such compensation for the rendering of 'investment advice.'" DOL Advisory Opinion 83-60A (Nov. 21, 1983), *in* ERISA for Money Managers and Advisers § 2:51 (Sept. 2016 Update). Instead, "if, under the particular facts and circumstances, the services provided by the broker-dealer include the provision of 'investment advice'" as defined by the regulation—i.e. on a regular basis pursuant to a mutual agreement to provide individualized advice—only then "may [it] be reasonably expected that, even in the absence of a distinct and identifiable fee for such advice, a portion of the commissions paid to the broker-dealer would represent compensation for the provision of such investment advice." *Id.*

No. 17-10238

DOL's 1975 regulation flowed directly from contemporary understanding of "investment advice for a fee," which contemplated an intimate relationship between adviser and client beyond ordinary buyer-seller interactions. The Fiduciary Rule is at odds with that understanding.

Substantial case law has followed and adopted DOL's original dichotomy between mere sales conduct, which does not usually create a fiduciary relationship under ERISA, and investment advice for a fee, which does. In the Fifth Circuit, this court held that "[s]imply urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those products." *Am. Fed'n of Unions v. Equitable Life Assurance Soc'y,* 841 F.2d 658, 664 (5th Cir. 1988*).* Applying the DOL's 1975 regulation of an "investment advice fiduciary," the Seventh Circuit refused to hold a brokerage firm liable for the failure of investments it sold to an ERISA plan, but the court emphasized that there was

> nothing in the record to indicate that Jones or its employees had agreed to render individualized investment advice to the Plan. . . . The only 'agreement' between the parties was that the trustees would listen to Jones' sales pitch and if the trustees liked the pitch, the Plan would purchase from among the suggested investments, *the very cornerstone of a typical broker-client relationship.*

*Farm King Supply, Inc. v. Edward D. Jones & Co.,* 884 F.2d 288, 293 (7th Cir. 1989) (emphasis added). The Eleventh Circuit, relying upon "numerous" cases, dismissed a claim that an insurance company's selling of life policies to an ERISA plan, without more, sufficed to give rise to fiduciary duties to the plan. *Cotton v. Mass. Mut. Life Ins. Co.,* 402 F.3d 1267, 1278-79 (11th Cir. 2005).

The SEC has also repeatedly held that "[t]he very function of furnishing [investment advice for compensation]—learning the personal and intimate details of the financial affairs of clients and making recommendations as to purchases and sales of securities—cultivates a confidential and intimate

22

relationship"—rendering a broker-dealer who does so "a fiduciary." Hughes, Exchange Act Release No. 4048, 1948 WL 29537, at *4, *7 (Feb. 18, 1948), *aff'd sub nom.*, *Hughes v. SEC*, 174 F.2d 969 (D.C. Cir. 1949); *see also* Mason, Moran & Co., Exchange Act Release No. 4832, 1953 WL 44092, at *4 (Apr. 23, 1953). The SEC cautioned that fiduciary status does not follow "merely from the fact that [the broker-dealer] renders investment advice." *Hughes*, 1948 WL 29537, at *7. Indeed, broker-dealers "who render investment advice merely as an incident to their broker-dealer activities" are not fiduciaries "unless they have by a course of conduct placed themselves in a position of trust and confidence as to their customers." *Id.* The SEC's industry-based distinction thus long predated the passage of ERISA.[8]

Significant federal and state legislation also used the term "investment adviser" to exclude broker-dealers when their investment advice was "solely incidental" to traditional broker-dealer activities and for which they received no "special compensation." The Investment Advisers Act of 1940, for example, defines "investment adviser" as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities[.]" 15 U.S.C. § 80b-2(a)(11). But the Act excludes "any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." *Id.*[9] Later

---

[8] Worth noting is that if the Fiduciary Rule is upheld, it places broker-dealers who work with clients about *both* individual retirement plans and ordinary brokerage accounts in an untenable position; they will be covered by two separate, complex regulatory regimes depending on the client's account or accounts they are discussing.

[9] Contrary to the dissent's implication that the Investment Advisers Act ought to be semantically identical to ERISA before any comparison may be drawn, we reference that statute as background authority, which demonstrates Congressional awareness, when ERISA was enacted, of the difference between a fiduciary's offering regular investment advice for a fee and ordinary brokerage transactions. There is nothing illogical in reading ERISA's

interpreting the Act, the Supreme Court highlighted legislative history in which "leading investment advisers emphasized their relationship of 'trust and confidence' with their clients," and the Court stated that the Act reflected Congress's recognition of "the delicate fiduciary nature of an investment advisory relationship." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 190–91 (1963) (quotation marks and citation omitted). Numerous contemporary state statutes also excluded broker-dealers from investment-adviser fiduciary status either completely or to the extent that the advice was incidental to their traditional activities and they did not receive special compensation for the advice.[10]

The contemporary case law similarly demonstrates that when investment advice was procured "on a fee basis," it entailed a substantial, ongoing relationship between adviser and client. *See, e.g.*, *SEC v. Ins. Sec., Inc.*, 254 F.2d 642, 645 (9th Cir. 1958) (company receives a "management and investment supervisory fee for investment advice" on annual bases); *Kukman v. Baum*, 346 F. Supp. 55, 56 (N.D. Ill. 1972) ("Supervisor[] furnishes investment advice" and "receives a monthly fee calculated on the net value of the fund's assets."); *Norman v. McKee*, 290 F. Supp. 29, 34 (N.D. Cal. 1968) ("For its services, including administration, management and investment advice, ISI charges a so-called 'Management Fee' of 1 1/2% Per year of the face amount of each outstanding investment certificate."); *Acampora v. Birkland*,

---

1974 definition of "fiduciary" to embody a well-accepted distinction. *See Sekhar v. U.S.,* 133 S. Ct. 2720, at 2724 (2013)(observing, "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."(internal quotation marks and citation omitted)).

[10] *See, e.g.*, Cal. Corp. Code § 25009 (1968); Del. Code tit. 6, § 7302(1)(f)3 (1973); Ky. Rev. Stat. 292.310(7)(c) (1972); Mont. Code § 30-10-103(5)(c) (1961); N.Y. Gen. Bus. Law § 359-eee(1)(a)3 (1960); N.D. Cent. Code § 10-04-02(10) (1951); 70 Pa. Stat. and Cons. Stat. § 1-102(j)(iii) (1972); Utah Code § 61-1-13(6)(c) (1963); Wash. Rev. Code § 21.20.005(6)(c) (1967); W. Va. Code § 32-4-401(f)(3) (1974).

No. 17-10238

220 F. Supp. 527, 533 (D. Colo. 1963) (entity "undertook to employ independent investment counsel" "for the purpose of the rendition of investment advice," and in return the entity received a fee equal to 0.5% of the advice recipient's yearly net asset value); *Glicken v. Bradford*, 204 F. Supp. 300, 302 (S.D.N.Y. 1962) (company "is engaged in furnishing investment advice on a fee basis to its clients"); *SEC v. Fiscal Fund*, 48 F. Supp. 712, 713 & n.7 (D. Del. 1943) ("for a stated fee" of "approximately $3,000 per annum," company agreed to "furnish all services, including management, investment advice and clerical assistance").

In short, whether one looks at DOL's original regulation, the SEC, federal and state legislation governing investment adviser fiduciary status vis-à-vis broker-dealers, or case law tying investment advice for a fee to ongoing relationships between adviser and client, the answer is the same: "investment advice for a fee" was widely interpreted hand in hand with the relationship of trust and confidence that characterizes fiduciary status.

DOL's invocation of two dictionary definitions of "investment" and "advice" pales in comparison to this historical evidence. That DOL contradicts its own longstanding, contemporary interpretation of an "investment advice fiduciary" and cannot point to a single contemporary source that interprets the term to include stockbrokers and insurance agents indicates that the Rule is far afield from its enabling legislation. DOL admits as much in conceding that the new Rule would "sweep in some relationships" that "the Department does not believe Congress intended to cover as fiduciary."

Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). Had Congress intended to abrogate both the cornerstone of fiduciary status—the relationship of trust and confidence—and the widely shared understanding that financial salespeople are not fiduciaries absent that special relationship, one would reasonably

25

expect Congress to say so.  This is particularly true where such abrogation portends consequences that "are undeniably significant."  Accordingly, the Fiduciary Rule's interpretation of "investment advice fiduciary" fatally conflicts with the statutory text and contemporary understandings.

### 4.    Consistency with other prongs of ERISA's "fiduciary" definition

In addition to the preceding flaws, the Fiduciary Rule renders the second prong of ERISA's fiduciary status definition in tension with its companion subsections.  The Rule thus poses a serious harmonious-reading problem.  *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").  The investment-advice prong of the statutory application of "fiduciary" is bookended by one subsection that defines individuals as fiduciaries with respect to a plan to the extent they exercise "any discretionary authority or . . . control" over the management of a retirement plan or "any authority or control" over its assets. 29 U.S.C. § 1001(21)(A)(i); 26 U.S.C. § 4975(e)(3)(A).  The following prong identifies as fiduciaries those individuals to the extent they possess "any discretionary authority or . . . responsibility" in a plan's administration. 29 U.S.C. § 1001(21)(A)(iii); 26 U.S.C. § 4975(e)(3)(C).  In *Mertens*, the Supreme Court was emphatic that these prongs defined "fiduciary" in "functional terms of control and authority." *See Mertens v. Hewitt Assocs.,* 508 U.S. 248, 262 (1993).  The phrase "control and authority" necessarily implies a special relationship beyond that of an ordinary buyer and seller.

Sandwiched between the two "control and authority" prongs, the interpretation of an "investment advice fiduciary" should gauge that subdivision by the company it keeps and should uniformly apply the trust and confidence standard in all three provisions.  *Roberts v. Sea-Land Servs., Inc.,*

No. 17-10238

566 U.S. 93, 101 (2012) ("the words of a statute must be read in their context" (quotation omitted)). The inference of textual consistency is reinforced by the similar phrasing in the last clause of the investment advice fiduciary prong, which refers to a person "with any authority or responsibility" to render investment advice for a fee. Salespeople in ordinary buyer-seller transactions have no such authority or responsibility.[11]

Countertextually, the Fiduciary Rule's interpretation of an "investment advice fiduciary" lacks any requirement of a special relationship. DOL thus asks us to differentiate within the definition of "fiduciary"—rendering the definition a moving target depending on which of the three prongs is at issue. Standard textual interpretation disavows that disharmony.

There is also no merit in DOL's reliance on *Mertens* for the broader proposition that ERISA departed from the common law definition of "fiduciary." DOL emphasizes the Court's statement that, by defining fiduciary in "functional" terms, Congress "expand[ed] the universe of persons subject to fiduciary duties." *Mertens*, 508 U.S. at 262.

DOL's quotation is correct but beside the point. The question in *Mertens* was whether individuals who were not subject to fiduciary duties at common law could be sued under ERISA. *See id.* at 261–62. This question arose because under the common law, not only the named trustee, but also individuals who "knowingly participated" in a named trustee's breach of his fiduciary duties, could be held liable. *Id.* at 256. The Court held that this was

---

[11] The dissent appears to contend that the "investment advice fiduciary" prong of ERISA's definition would be "stripped of meaning" by the other two prongs of that definition were it required to incorporate traditional fiduciary standards. On the contrary, each provision covers a distinct aspect of ERISA plan governance: control over the management or assets of the plan (i); rendering investment advice for a fee to the plan (ii); and discretionary authority in plan administration (iii). Although potentially somewhat overlapping, these activities are conceptually and practically distinguishable.

no longer the case under ERISA. Although Congress "expand[ed] the universe of persons subject to fiduciary duties" by defining "fiduciary" "not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan," Congress actually limited the number of persons that could be sued. *Id.* at 262. ERISA differed from common law by excluding "persons who [despite participation in the trustee's breach] had no real power to control what the plan did." *Id.*

Under *Mertens,* ERISA eliminated the "formal trusteeship" requirement and applied fiduciary status to all individuals who have "control and authority over the plan." *Id.* The reason for this is clear: "Professional service providers such as actuaries become liable for damages when they *cross the line from adviser to fiduciary*." *Id.* (emphasis added). Thus, the Court understood ERISA to apply to those who act as fiduciaries, regardless whether they are named fiduciaries. That understanding is *consistent*, not *inconsistent*, with the common law trust and confidence standard.

Moreover, although ERISA "abrogate[d] the common law in certain respects" concerning "formal trusteeship," "we presume that Congress retained all other elements of common-law [fiduciary status] that are consistent with the statutory text because there are no textual indicia to the contrary." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1999 n.2 (2016).[12] There is no inconsistency between the statutory structure and the

---

[12] For the same reason, DOL's reliance on *Varity Corp.* and *Pegram v. Herdrich*, 530 U.S. 211 (2000) as "cases [that] endors[e] other departures from the common law concerning fiduciaries," does not advance the ball. Those cases stand for the unremarkable proposition that, although an individual may hold both fiduciary and non-fiduciary positions, the individual must be acting as a fiduciary to be subject to ERISA fiduciary duties. *See Pegram*, 530 U.S. at 224–26, *Varity Corp.*, 516 U.S. at 498. Again, the trust-and-confidence standard is consistent, not inconsistent, with those holdings.

common law trust and confidence standard that "require[s] departing from common-law trust requirements." *Varity Corp.*, 516 U.S. at 497.

### 5.    Purposes

DOL ultimately falls back on statutory purposes.  DOL points to the alleged negative repercussions of appellants' position, namely that "many investment advisers would be able to 'play a central role in shaping' retirement investments without the fiduciary safeguards 'for persons having such influence and responsibility.'" (quoting 81 Fed. Reg. 20955).  DOL also says that appellants "cannot show that DOL acted unreasonably in determining that their proposed trust-and-confidence requirement would 'undermine[] rather than promote[]' ERISA's goals." (quoting 81 Fed. Reg. 20955).  Finally, citing *United States v. Guidry*, 456 F.3d 493, 510–11 (5th Cir. 2006), DOL concludes that "[s]uch inconsistency with statutory purposes is alone sufficient to displace the common law, as *Varity* reflects and this Court has held in other contexts."

None of these arguments holds water.  DOL's invocation of ERISA's purposes is unpersuasive in light of *Mertens*.  There, the petitioners asked for a particular interpretation of ERISA "in order to achieve the 'purpose of ERISA to protect plan participants and beneficiaries.'"  508 U.S. at 261.  The petitioners complained that a different interpretation would "leave[] beneficiaries like petitioners with *less* protection than existed before ERISA, contradicting ERISA's basic goal of 'promot[ing] the interests of employees and their beneficiaries in employee benefit plans.'"  *Id.* (quoting *Shaw*, 463 U.S. at 90).  *Mertens* rejected these complaints because "vague notions of a statute's 'basic purpose' are nonetheless inadequate to overcome the words of its text regarding the *specific* issue under consideration."  *Id.*  Indeed, the Court said that "[t]his is especially true with legislation such as ERISA, an enormously complex and detailed statute that resolved innumerable disputes between

powerful competing interests—not all in favor of potential plaintiffs." *Id.* at 262; *see also Darden*, 503 U.S. at 324-25 (rejecting broader definition of employee based solely on the "goals" of ERISA). DOL's complaints here about "undermining ERISA's goals" are no less vague than the notions rejected in *Mertens* and *Darden*.

Moreover, DOL's principal policy concern about the lack of fiduciary safeguards in Title II was present when the statute was enacted, but Congress chose not to require advisers to individual retirement plans to bear the duties of loyalty and prudence required of Title I ERISA plan fiduciaries. That times have changed, the financial market has become more complex, and IRA accounts have assumed enormous importance are arguments for Congress to make adjustments in the law, or for other appropriate federal or state regulators to act within their authority. A perceived "need" does not empower DOL to craft *de facto* statutory amendments or to act beyond its expressly defined authority.

Finally, DOL's reliance on *Guidry* is misleading and misplaced. *Guidry* was a criminal kidnapping-enhancement case in which this court was required to define the term "kidnap." 456 F.3d at 509–11. This court noted that "[w]e do not use the common law definition of any term where it would be inconsistent with the statute's purpose, notably where the term's definition has evolved." *Id.* at 509. This court applied the modern definition because the term "kidnap" had evolved so far from the antiquated common law that the common-law definition "would come close to nullifying the term's effect in the statute." *Id.* at 510-11 (quoting *Taylor v. United States*, 495 U.S. 575, 594 (1990)). Unlike the term "kidnap," the term "fiduciary" has not "evolved" over time.

In sum, using the "regular interpretive method leaves no serious question, not even about purely textual ambiguity" in ERISA. *Gen. Dynamics*

*Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004). DOL cannot displace the presumption of common-law meaning because there is no inconsistency between the common-law trust-and-confidence standard and the statutory definition of "fiduciary." The Fiduciary Rule conflicts with the plain text of the "investment advice fiduciary" provision as interpreted in light of contemporary understandings, and it is inconsistent with the entirety of ERISA's "fiduciary" definition. DOL therefore lacked statutory authority to promulgate the Rule with its overreaching definition of "investment advice fiduciary." [13]

## B. The Fiduciary Rule fails the "reasonableness" test of *Chevron* step 2 and the APA.

Under Step 2 of *Chevron,* "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843. Notwithstanding the preceding discussion, we assume *arguendo* that there is some ambiguity in the phrase "investment advice for a fee." In that case, the *Chevron* doctrine requires that DOL's regulatory interpretation be upheld if it is "reasonable." *Id.* at 845.[14] In addition, the

---

[13] As noted at the beginning of this analysis, the Fiduciary Rule's overbreadth flows from DOL's concession that any financial services or insurance salesman who lacks a relationship of trust and confidence with his client can nonetheless be deemed a fiduciary. This conclusion, however, does not mean that any regulation of such transactions, or of IRA plans, is proscribed. ("To the extent . . . that some brokers and agents hold themselves out as advisors to induce a fiduciary-like trust and confidence, the solution is for an appropriately authorized agency to craft a rule addressing *that* circumstance, not to adopt an interpretation that deems the speech of a salesperson to be that of a fiduciary, and that concededly is so overbroad that . . . it must be accompanied by a raft of corrections.").

[14] This court is bound by the Supreme Court's decisions to defer to an agency's "reasonable" construction of an ambiguous statute within its realm of enforcement responsibility. Nevertheless, the *Chevron* doctrine has been questioned on substantial grounds, including that it represents an abdication of the judiciary's duty under Article III "to say what the law is," and thus turns over judicial power to politically unaccountable employees of the Executive Department. *See, e.g., Michigan v. E.P.A.*, 135 S. Ct. 2699, 2712 (2015) (Thomas, J., concurring) ("*Chevron* deference precludes judges from exercising

regulation must withstand APA review, ensuring it is not arbitrary, capricious, contrary to law or in excess of statutory authority. 5 U.S.C. § 706(2)(A). Although DOL is empowered to enact regulations enforcing the fiduciary provisions of ERISA Title I, including the definition of "fiduciary" in Titles I and II, the Rule fails to pass the tests of reasonableness or the APA.

Bear in mind that DOL's 1975 regulations only covered "investment advice fiduciaries" who rendered advice regularly and as the primary basis for clients' investment decisions. The Fiduciary Rule extends regulation to any financial transaction involving an ERISA or IRA plan in which "advice" plays a part, and a fee, "direct or indirect," is received. The Rule expressly includes one-time IRA rollover or annuity transactions where it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers. Through the BIC Exemption, the Rule undertakes to regulate these and myriad other transactions as if there were little difference between them and the activities of ERISA employer-sponsored plan fiduciaries. Finally, in failing to grant certain annuities the long-established protection of PTE 84-24, the Rule competitively disadvantages their market because DOL believes these annuities are unsuitable for IRA investors.

---

[independent] judgment, forcing them to abandon what they believe is 'the best reading of an ambiguous statute' in favor of an agency's construction.") (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005)); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1152 (10th Cir. 2016) (Gorsuch, J., concurring) ("*Chevron* seems no less than a judge-made doctrine for the abdication of the judicial duty."); *Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1027-32 (6th Cir. 2016), *rev'd on other grounds*, 137 S. Ct. 1562 (2017) (Sutton, J., concurring in part and dissenting in part) (arguing the rule of lenity should trump *Chevron* deference when the Immigration and Nationality Act's civil provisions have the possibility of entailing criminal consequences); Philip Hamburger, Is Administrative Law Unlawful? 316 (2014). Although the status of *Chevron* may be uncertain, the parties vigorously disputed the applicability of *Chevron* and we must respond to their arguments.

No. 17-10238

Not only does the Rule disregard the essential common law trust and confidence standard, but it does not holistically account for the language of the "investment advice fiduciary" provision or for the additional prongs of ERISA's fiduciary definition.  The Supreme Court has warned that "there may be a question about whether [an agency's] departure from the common law…with respect to particular questions and in a particular statutory context[] renders its interpretation unreasonable."  *NLRB v. Town & Country Elec., Inc.,* 516 U.S. 85, 94 (1995).  Given that the text here does not compel departing from the common law (but actually embraces it), and given that the Fiduciary Rule suffers from its own conflicts with the statutory text, the Rule is unreasonable.

Moreover, that it took DOL forty years to "discover" its novel interpretation further highlights the Rule's unreasonableness.  *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014) (hereinafter, "*UARG*") ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.") (citation and quotation marks omitted).  DOL's turnaround from its previous regulation that upheld the common law understanding of fiduciary relationships alone gives us reason to withhold approval or at least deference for the Rule.  *See Gen. Elec. Co. v. Gilbert,* 429 U.S. 125, 142 (1976) (overturning an agency guideline that was "not a contemporaneous interpretation of Title VII," and "flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute");  *see also Watt v. Alaska,*  451 U.S. 259, 272-73 (1981) ("[P]ersuasive weight" is due to an agency's contemporaneous construction of applicable law and subsequent consistent interpretation, whereas a "current interpretation, being in conflict with its initial position, is entitled to considerably less deference.").

33

No. 17-10238

The following problems highlight the unreasonableness of the Rule and its incompatibility with APA standards.

First, the Rule ignores that ERISA Titles I and II distinguish between DOL's authority over ERISA employer-sponsored plans and individual IRA accounts.  By statute, ERISA plan fiduciaries must adhere to the traditional common law duties of loyalty and prudence in fulfilling their functions, and it is up to DOL to craft regulations enforcing that provision. 29 U.S.C. §§ 1001(b), 1104. IRA plan "fiduciaries," though defined statutorily in the same way as ERISA plan fiduciaries, are not saddled with these duties, and DOL is given no direct statutory authority to regulate them.  As to IRA plans, DOL is limited to defining technical and accounting terms, 11 U.S.C. § 1135, and it may grant exemptions from the prohibited transactions provisions. 26 U.S.C. § 4975(c)(2), 29 U.S.C. § 1108(a).  Hornbook canons of statutory construction require that every word in a statute be interpreted to have meaning, and Congress's use and withholding of terms within a statute is taken to be intentional.  It follows that these ERISA provisions must have different ranges; they cannot mean that DOL may comparably regulate fiduciaries to ERISA plans and IRAs. *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014).  Despite the differences between ERISA Title I and II, DOL is treating IRA financial services providers in tandem with ERISA employer-sponsored plan fiduciaries. The Fiduciary Rule impermissibly conflates the basic division drawn by ERISA.

DOL's response to the statutory distinction is that it has broad power to exempt "prohibited transactions."    *See*  29 U.S.C.  § 1108(a);  26 U.S.C. § 4975(c)(2).  It has abused that power.  The test is whether an exemption is administratively feasible; in the interests of the plan, its participants and beneficiaries; and protective of participants' and beneficiaries' rights. *Id.* DOL adopted the BICE provisions after redefining "investment advice fiduciary" for

34

two essential reasons.  To begin with, DOL knew, and continues to concede, its new definition encompassed actors and transactions that the Department "does not believe Congress intended to cover as fiduciary."  DOL had to create exemptions not exclusively for the statutory purposes, but to blunt the overinclusiveness of the new definition.  Were it not for DOL's ahistorical and strained interpretation of "fiduciary," there would be no rationale for the BICE exemptions.  Thus, when DOL argues that any exemptions would be more lenient on IRA financial services providers than deeming their ordinary activities to fall within the ERISA Title II prohibited transactions provision, DOL proves too much.

Additionally, the "exemptions" actually subject most of these newly regulated actors and transactions to a raft of affirmative obligations.  Among the new requirements, brokers and insurance salespeople assume obligations of loyalty and prudence only statutorily required of ERISA plan fiduciaries.  Further, when brokers and insurance representatives use the BICE exemptions (as they must in order to preserve their commissions), they are required to expose themselves to potential liability *beyond* the tax penalties provided for in ERISA Title II.  *See* 26 U.S.C. § 4975(a).  ERISA employer-sponsored plan fiduciaries may be sued under Title I, 29 U.S.C. § 1132(a), but federal law did not expose brokers and insurance salespeople to private claims of IRA investors until the Fiduciary Rule was promulgated.  On this basic level, DOL unreasonably failed to follow its statutory guidance and the clear distinction in the scope of its authority under ERISA Titles I and II.

Second, insofar as the Fiduciary Rule defines "investment advice fiduciary" to include anyone who makes a suggestion "to a specific advice recipient . . . regarding the advisability of a particular investment . . . decision," it comprises nearly any broker or insurance salesperson who deals with IRA clients.  Under ERISA, however, fiduciaries are generally prohibited

from selling financial products to plans. 26 U.S.C. § 4975(c)(1), 29 U.S.C. § 1106(b). As the Chamber of Commerce puts it, the Rule "treats the fact that a person has done something that a fiduciary generally may *not* [do], as dispositive evidence that the person is a fiduciary." Transforming sales pitches into the recommendations of a trusted adviser mixes apples and oranges.[15] But the Rule is not even consistently transformative: it acknowledges the distinction between sales and fiduciary advice by what it frankly called a "seller's carve-out" for certain transactions involving ERISA Title I plans with more than $50 million in assets. *See* 29 C.F.R. § 2510-3.21(c)(1) (2016). DOL explained that the purpose of the carve-out was "to avoid imposing ERISA fiduciary obligations on sales pitches that are part of arm's length transactions where neither side assumes that the counterparty to the plan is acting as an impartial or trusted adviser." 81 Fed. Reg. at 20980. Only DOL's fiat supports treating smaller-scale sales pitches, those not carved out, as if the counterparty is acting as an impartial or trusted adviser. Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action.

Another such marker is the overbreadth of the BIC Exemption when compared with an exception that Congress enacted to the prohibited transactions provisions. 26 U.S.C. § 4975(d)(17) exempts from "prohibition" transactions involving certain "eligible investment advice arrangements" for individually directed accounts. 26 U.S.C. § 4975(e)(3)(B); 26 U.S.C.

---

[15] *See, e.g., Burton v. R. J. Reynolds Tobacco Co.,* 397 F.3d 906, 911-913 (10th Cir. 2005) (noting "the weight of core authority holding that the relationship between a product buyer and seller is not fiduciary in nature"); *Farm King Supply*, 884 F.2d at 294 ("Jones offered the plan individualized solicitations much the same way a car dealer solicits particularized interest in its inventory."); *Schlumberger Tech. v. Swanson,* 959 S.W.2d 171, 177 (Tex. 1997) ("while a fiduciary or confidential relationship may arise from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit;" and "mere subjective trust does not, as a matter of law, transform arm's-length dealing into a fiduciary relationship").

§ 4975(f)(8)(A), (B).  Moreover, in describing the transactions not prohibited by Section 4975(d)(17), Congress distinguished two activities:  "the provision of investment advice" and "the . . . sale of a security . . . ."    26 U.S.C. § 4975(d)(17)(A)(i), (ii).  Congress further distinguished the "direct or indirect receipt of fees" "in connection with the . . . advice" from fees "in connection with the . . . sale of a security . . . ."  20 U.S.C. § 4975(d)(17)(A)(iii).  That Congress distinguished sales from the provision of investment advice is consistent with this opinion's interpretation of the statutory term, "render[ing] investment advice for a fee," 29 U.S.C. § 1002(21)(A)(ii), and  inconsistent with DOL's conflating sales pitches and investment advice.

Even more remarkable, DOL had to exclude Congress's nuanced § 4975(d)(17) exemption from the BICE exemption's onerous provisions. 81 Fed. Reg. 20982 n.33.  But for this exclusion, the BIC Exemption would have brazenly overruled Congress's careful striking of a balance in the regulation of "prohibited transactions" concerning certain self-directed IRA plans. DOL candidly summarizes the intersection of its far broader Rule with Congress's exclusion contained in the Pension Protection Act of 2006 (PPA):

> [T]he PPA created a new statutory exemption that allows fiduciaries giving investment advice to individuals…to receive compensation from investment vehicles that they recommend in certain circumstances.    29 U.S.C. 1108(b)(14); 29 U.S.C. 4975(d)(17).    Recognizing the risks presented when advisers receive fees from the investments they recommend to individuals, Congress placed important constraints on such advice arrangements that are calculated to limit the potential for abuse and self-dealing….Thus, the PPA statutory exemption remains available to parties that would become investment advice fiduciaries [under the Fiduciary Rule] *because of the broader definition in this final rule*….

*Id.* (emphasis added).

37

Unlike the BIC Exemption regulations, Congress's exemption did not require detailed contractual provisions or subject "fiduciaries" involved in Section 4975(d)(17) transactions to the possibility of class actions suits without damage limitations. When Congress has acted with a scalpel, it is not for the agency to wield a cudgel. *See Fin. Planning Ass'n. v. SEC,* 482 F.3d 481 (D.C. Cir. 2007) (overturning SEC's broad regulatory exemption contrary to Congress's narrower exemption).

Third, the Rule's status is not salvaged by the BICE, which as noted was designed to narrow the Rule's overbreadth. The Supreme Court addressed such a tactic when it held that agencies "are not free to adopt unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness." *See UARG*, 134 S. Ct. at 2446 (internal quotations and alterations omitted). This is the vice in BICE, which exploits DOL's narrow exemptive power in order to "cure" the Rule's overbroad interpretation of the "investment advice fiduciary" provision. DOL admitted that without the BIC Exemptions, the Rule's overbreadth could have "serious adverse unintended consequences." 81 Fed. Reg. at 21062. That a cure was needed "should have alerted [the agency] that it had taken a wrong interpretive turn." *UARG*, 134 S. Ct. at 2446. The BIC Exemption is integral to retaining the Rule. Because it is independently indefensible, this alone dooms the entire Rule.

Fourth, BICE extends far beyond creating "conditional" "exemptions" to ERISA's prohibited transactions provisions. Rather than ameliorate overbreadth, it deliberately extends ERISA Title I statutory duties of prudence and loyalty to brokers and insurance representatives who sell to IRA plans, although Title II has no such requirements. The BIC Exemption creates these duties and burdensome warranty and disclosure requirements by writing provisions for the regulated parties' contracts with IRA owners. The

contractual mandates fulfilled a "critical" and "central goal" of BICE, ensuring IRA owners' ability to enforce them with lawsuits, 81 Fed. Reg. 21020, 21021, 21033.  Incentives to private lawsuits include the BICE's additional provisions that reject damage limitations and class action waivers.  In stark contrast to these entangling regulations, ERISA Title II only punishes violations of the "prohibited transactions" provision by means of IRS audits and excise taxes. And unlike § 1132 of ERISA Title I, Title II contains no private lawsuit provision. Together, the Fiduciary Rule and the BIC Exemption circumvent Congress's withholding from DOL of regulatory authority over IRA plans.  The grafting of novel and extensive duties and liabilities on parties otherwise subject only to the prohibited transactions penalties is unreasonable and arbitrary and capricious.

Fifth, the BICE provisions regarding lawsuits also violate the separation of powers, as reflected in *Alexander v. Sandoval* and its progeny. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1387-88 (2015) ("a private right of action under federal law is not created by mere implication, but must be 'unambiguously conferred'") (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)); *Alexander v. Sandoval,* 532 U.S. 275, 286 (2001) ("private rights of action to enforce federal law must be created by Congress").  Only Congress may create privately enforceable rights, and agencies are empowered only to enforce the rights Congress creates. *See Alexander,* 532 U.S. at 291.  In ERISA, Congress authorized private rights of action for participants and beneficiaries of employer sponsored plans, 29 U.S.C. § 1132(a), but it did not so privilege IRA owners under Title II.  DOL may not create vehicles for private lawsuits indirectly through BICE contract provisions where it could not do so directly. *Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 117-19 (2011).  Yet DOL did not apply the BIC Exemption enforceability provisions to ERISA employer-sponsored plan fiduciaries precisely because ERISA already subjects those

entities to suits by private plaintiffs.  81 Fed. Reg. 21022.  This action admits DOL's purpose to go beyond Congressionally prescribed limits in creating private rights of action.

Further, whether federal or state law may be the vehicle for DOL's BICE-enabled lawsuits is immaterial in the absence of statutory authorization. If the IRA owners' lawsuits are intended to be cognizable under federal law, the absence of statutory basis is obvious.  If the BICE-mandated provisions are intended to authorize new claims under the fifty states' different laws, they are no more than an end run around Congress's refusal to authorize private rights of action enforcing Title II fiduciary duties.  Paraphrasing the Supreme Court, "[t]he absence of a private right to enforce [Title II fiduciary duties] would be rendered meaningless if [IRA owners] could overcome that obstacle by suing to enforce [DOL-imposed contractual] obligations instead.  The statutory and contractual obligations, in short, are one and the same."  *Astra USA, Inc.,* 563 U.S. at 117; *see also Umland v. Planco Fin. Serv., Inc.*, 542 F.3d 59, 67 (3d Cir. 2008)(reading FICA's provisions into every employment contract would contradict Congress's decision not to expressly include a private right of action).  DOL's assumption of non-existent authority to create private rights of action was unreasonable and arbitrary and capricious.

Although it is now disavowed by DOL, another unsustainable feature of the BIC Exemption is the forced rejection, in transactions involving transaction-based compensation, of contractual provisions that would have allowed arbitration of class action claims.  This contractual condition violates the Federal Arbitration Act.  The Supreme Court has broadly applied the Federal Arbitration Act's promotion of voluntary arbitration agreements. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983). State law provisions that have attempted to condition or limit the availability of an arbitral forum have been consistently struck down.  *See, e.g, AT&T*

*Mobility, Inc. v. Concepcion,* 563 U.S. 333, 336 (2011) (conditions on class-wide arbitration struck down); *OPE Int'l LP v. Chet Morrison Contactors, Inc.,* 258 F.3d 443, 447 (5th Cir. 2001) (state may not condition enforcement of an arbitration agreement on absence of a forum selection clause).  That DOL has retreated from its overreach (although not yet by formal rule amendment) does not detract from the impermissible nature of the provisions in the first place. *See also Thrivent Fin. for Lutherans v. Acosta*, No. 16-cv-03289, 2017 WL 5135552 (D. Minn. Nov. 3, 2017) (granting injunction against enforcement of the BICE exemption anti-arbitration condition).

The sixth "unreasonable" feature of the Fiduciary Rule lies in DOL's decision to outflank two Congressional initiatives to secure further oversight of broker/dealers handling IRA investments and the sale of fixed-indexed annuities.  The 2010 Dodd Frank Act amended both the Securities Exchange Act and the Investment Advisers Act of 1940, empowering the SEC to promulgate enhanced, uniform standards of conduct for broker-dealers and investment advisers who render "personalized investment advice about securities to a retail customer…." Dodd-Frank Act Sec. 913(g)(1), 124 Stat. 1827-28 (2010).  Significantly, Dodd-Frank prohibits SEC from eliminating broker-dealers' "commission[s] or other standard compensation." Dodd-Frank Act Sec. 913(g)(2), 124 Stat. at 1828 (2010).

Another provision of Dodd-Frank was spawned by a federal court's rejection of an SEC initiative to regulate fixed indexed annuities as securities. *See Am. Equity Inv. Life Ins. v. SEC,* 613 F.3d 166, 179 (D.C. Cir. 2010). In Dodd-Frank, Congress opted to defer such regulation to the states, which have traditionally and under federal law borne responsibility for thoroughgoing supervision of the insurance business.  Section 989J accordingly provides that "fixed indexed annuities sold in states that adopted the National Association of Insurance Commissioners' enhanced model suitability regulations, or

companies following such regulations, shall be treated as exempt securities not subject to federal regulation." Dodd-Frank Sec. 989J, 124 Stat. 1376, 1949-50 (2010).

The Fiduciary Rule conflicts with both of these efforts. The SEC has the expertise and authority to regulate brokers and dealers uniformly. DOL has no such statutory warrant, but far from confining the Fiduciary Rule to IRA investors' transactions, DOL's regulations effect dramatic industry-wide changes because it is impractical to separate IRA transactions from non-IRA securities advice and brokerage. Rather than infringing on SEC turf, DOL ought to have deferred to Congress's very specific Dodd-Frank delegations and conferred with and supported SEC practices to assist IRA and all other individual investors. By presumptively outlawing transaction-based compensation as "conflicted," the Fiduciary Rule also undercuts the Dodd-Frank provision that instructed SEC not to prohibit such standard forms of broker-dealers' compensation. And in direct conflict with Congress's approach to fixed indexed annuities, DOL's regulatory strategy not only deprives sellers of those products of the enhanced PTE 84-24 exemption but it also subjects them to the stark alternatives of using the BIC Exemption, creating entirely new compensation schemes, or withdrawing from the market. While Congress exhibited confidence in the states' insurance regulation, DOL criticizes the Dodd-Frank provisions as "insufficient" to protect the "subset" of retirement-related fixed-indexed annuities transactions within DOL's purview. Certainly, however, most such products are sold to retirement investors, so DOL is occupying the Dodd-Frank turf.

DOL contends that legislation pertaining to the SEC does not detract from its authority to regulate "fiduciaries" to IRA investors, but we are unconvinced. Congress does not ordinarily specifically delegate power to one agency while knowing that another federal agency stands poised to assert the

No. 17-10238

very same power. DOL's direct imposition on the delegation to SEC is made plain by the text of Dodd-Frank Section 913(g)(2), which states:

> The Commission may promulgate rules to provide that the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customers (and such other customers as the Commission may by rule provide), shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice. In accordance with such rules, any material conflicts of interest shall be disclosed and may be consented to by the customer. Such rules shall provide that such standard of conduct shall be no less stringent than the standard applicable to investment adviser[s] under sections 206(1) and (2) of this Act when providing personalized investment advice about securities, except the Commission shall not ascribe a meaning to the term *customer* that would include an investor in a private fund managed by an investment adviser, where such private fund has entered into an advisory contract with such adviser. The receipt of compensation based on commission or fees shall not, in and of itself, be considered a violation of such standard applied to a broker, dealer or investment adviser. (emphasis added)

As a major securities law treatise explains, the genesis of this provision was an SEC initiative commencing in 2006 to address "Trends Blurring the Distinction Between Broker-Dealers and Investment Advisers." *See* LOUIS LOSS, ET AL., 2 FUNDAMENTAL OF SECURITIES REGULATION 1090–94 (2011). Congress was concerned to protect all retail investment clients, and there is no evidence that Congress expected DOL to more restrictively regulate a trillion dollar portion of the market when it delegated the general question to the SEC (for broker-dealers and registered investment advisers) and conditionally deferred to state insurance practices.[16]

---

[16] DOL contends that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price,* 361 U.S. 304, 313 (1960). In this case, however, Congress made plain the comprehensive scope of its intent. Congress had

No. 17-10238

Seventh, regardless of the precise status of a "major questions" exception to *Chevron* analysis, *see generally* Josh Blackman, *Gridlock*, 130 HARV. L. REV. 241, 261 (2016), there is no doubt that the Supreme Court has been skeptical of federal regulations crafted from long-extant statutes that exert novel and extensive power over the American economy. *See, e.g., King v. Burwell,* 135 S. Ct. 2480, 2488-89 (2015) (exhibiting no deference to certain Affordable Care Act regulations, because if Congress had wished to delegate to the IRS "a question of deep 'economic and political significance[,]' . . . central to th[e] statutory scheme, . . . it surely would have done so expressly"). The Court rejected a *Chevron* Step Two "reasonableness" justification for EPA regulations that "would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization." *UARG,* 134 S. Ct. at 2444. The Court further stated, "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Id.* (internal quotation omitted); *see also FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 160 (2000) (rejecting FDA bid to regulate the tobacco industry); *MCI Telecomms. Corp. v. AT&T Co.,* 512 U.S. 218, 234 (1994) (rejecting use of term "modify" in enabling statute to "effectively…introduc[e]…a whole new regime of regulation").

These decisions are not, as DOL contends, distinguishable. They restate fundamental principles deriving from the Constitution's separation of powers within the federal government. Congress enacts laws that define and, equally important, circumscribe the power of the Executive to control the lives of the

---

to be aware of the enormous impact of IRA investments on the overall market for personalized investment advice to retail customers. It is unreasonable to presume Congress would not have referred to—or carved out--DOL's claimed broad power over ERISA Title II transactions. Instead, the lack of any reference or carve-out in Dodd-Frank strongly suggests Congress, like DOL itself (until after 2010), did not suppose such DOL power was hidden in the interstices of ERISA.

citizens. When agencies within the Executive Branch defy Congressional limits, they lord it over the people without proper authority. Most instances of regulatory activity, no doubt, are underpinned by direct or necessary consequences of enabling statutes. But the guiding inquiry under *Chevron* Step Two is whether Congress intended to delegate interpretive authority over a question to the agency asserting deference. *City of Arlington,* 133 S. Ct. at 1868. It is not hard to spot regulatory abuse of power when "an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy…." *UARG,* 134 S. Ct. at 2444 (internal quotation action omitted).

DOL has made no secret of its intent to transform the trillion-dollar market for IRA investments, annuities and insurance products, and to regulate in a new way the thousands of people and organizations working in that market. Large portions of the financial services and insurance industries have been "woke" by the Fiduciary Rule and BIC Exemption. DOL utilized two transformative devices: it reinterpreted the forty-year old term "investment advice fiduciary" and exploited an exemption provision into a comprehensive regulatory framework. As in the *UARG* case, DOL found "in a long-extant statute an unheralded power to regulate a significant portion of the American economy." And, although lacking direct regulatory authority over IRA "fiduciaries," DOL impermissibly bootstrapped what should have been safe harbor criteria into "backdoor regulation." *Hearth, Patio & Barbecue Ass'n. v. US Dep't of Energy,* 706 F.3d 499, 507-08 (D.C. Cir. 2013). The Fiduciary Rule thus bears hallmarks of "unreasonableness" under *Chevron* Step Two and arbitrary and capricious exercises of administrative power.

## CONCLUSION

The APA states that a "reviewing court shall…hold unlawful and set aside agency action…found to be…arbitrary, capricious,…not in accordance

with law" or "in excess of statutory …authority[] or limitations."  5 U.S.C. § 706(2)(A), (C).   DOL makes no argument concerning severability of the provisions making up the Fiduciary Rule and BICE exemption apart from the illegal arbitration waiver.   In any event, this comprehensive regulatory package is plainly not amenable to severance. Based on the foregoing discussion, we **REVERSE** the judgment of the district court and **VACATE** the Fiduciary Rule *in toto.*

**JUDGMENT REVERSED; FIDUCIARY RULE VACATE**

No. 17-10238

CARL E. STEWART, Chief Judge, dissenting:

Over the last forty years, the retirement-investment market has experienced a dramatic shift toward individually controlled retirement plans and accounts. Whereas retirement assets were previously held primarily in pension plans controlled by large employers and professional money managers, today, individual retirement accounts ("IRAs") and participant-directed plans, such as 401(k)s, have supplemented pensions as the retirement vehicles of choice, resulting in individual investors having greater responsibility for their own retirement savings. This sea change within the retirement-investment market also created monetary incentives for investment advisers to offer conflicted advice, a potentiality the controlling regulatory framework was not enacted to address. In response to these changes, and pursuant to its statutory mandate to establish nationwide "standards . . . assuring the equitable character" and "financial soundness" of retirement-benefit plans, 29 U.S.C. § 1001, the Department of Labor ("DOL") recalibrated and replaced its previous regulatory framework. To better regulate conflicted transactions as concerns IRAs and participant-directed retirement plans, the DOL promulgated a broader, more inclusive regulatory definition of investment-advice fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Internal Revenue Code ("the Code").

Despite the relevant context of time and evolving marketplace events, Appellants and the panel majority skew valid agency action that demonstrates an expansive-but-permissible shift in DOL policy as falling outside the statutory bounds of regulatory authority set by Congress in ERISA and the Code. Notwithstanding their qualms with these regulatory changes and the effect the DOL's exercise of its regulatory authority might have on certain

47

sectors of the financial services industry, the DOL's exercise was nonetheless lawful and consistent with the Congressional directive to "prescribe such regulations as [the DOL] finds necessary or appropriate to carry out [ERISA's provisions]." 29 U.S.C. § 1135. Because I do not share the panel majority's concerns about the DOL's amended regulatory framework, I respectfully dissent.

## I.

A comprehensive recitation of the relevant regulatory and statutory background can be found in the district court's opinion. *See Chamber of Commerce of the United States of America, et al. v. Hugler, et al.*, 231 F. Supp. 3d 152 (N.D. Tex. Feb. 8, 2017). This appeal primarily turns on the DOL's interpretation of the parallel definitions of "investment-advice fiduciary" in ERISA and the Code. *See* 29 U.S.C. § 1002(21)(A)(ii); 26 U.S.C. § 4975(e)(3). Those provisions define an investment-advice fiduciary as one who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." *Id*. This statutory definition deliberately casts a wide net in assigning fiduciary responsibility with respect to plan assets. *See* Fiduciary Rule, 81 Fed. Reg. 20,954. Thus, any person who "renders investment advice for a fee or other compensation, direct or indirect," is an investment-advice fiduciary, "regardless of whether they have direct control over the plan's assets, and regardless of their status as an investment adviser or broker under federal securities laws." *Id*.

For 41 years, the DOL employed a five-part test to determine whether a person is an investment-advice fiduciary under ERISA and the Code, and that test limited the reach of the statutes' prohibited transaction rules to those who

rendered advice "on a regular basis," and to instances where such advice "serve[d] as a primary basis for investment decisions with respect to plan assets." *See* 29 C.F.R. § 2510.3–21(c)(1) (2015). This regulation "was adopted prior to the existence of participant-directed 401(k) plans, the widespread use of IRAs, and the now commonplace rollover of plan assets" from Title I plans to IRAs, thus leaving out of ERISA's regulatory reach many investment professionals, consultants, and advisers who play a critical role in guiding plans and IRA investments. Fiduciary Rule, 81 Fed. Reg. 20,946.

The rule challenged on appeal addresses these and other changes in the retirement investment advice market by, *inter alia*, abandoning the five-part test in favor of a definition of fiduciary that includes "recommendation[s] as to the advisability of acquiring . . . investment property that is rendered pursuant to [an] . . . understanding that the advice is based on the particular investment needs of the advice recipient." 29 C.F.R. § 2510.3–21(a) (2016). A "recommendation," in turn, includes a "communication that, *based on its content, context, and presentation*, would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action." *Id*. § 2510.3–21(b)(1) (emphasis added). Importantly, the regulatory definition of "investment-advice fiduciary" thoroughly and specifically describes communications that would otherwise be covered "recommendations," and gives examples of interactions and relationships that, under the broad regulatory definition of fiduciary, would qualify as "recommendations" but which are not "appropriately regarded as fiduciary in nature" under ERISA and are therefore circumscribed from the regulation's

49

No. 17-10238

definition. *See* 29 C.F.R. § 2510.3–21(b)–(c) (2016); Fiduciary Rule, 81 Fed. Reg. 20,971.[1]

Appellants, organizations and associations representing businesses and financial service providers who previously fell outside the DOL's definition of fiduciary but who are now governed by certain of the rule's new regulatory requirements, challenge the expansion. The panel majority finds many of Appellants' arguments persuasive and vacates the DOL's rule as unreasonable under *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and as arbitrary and capricious agency action under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA").[2] Because I believe the DOL's new regulations are a statutorily permissible and reasonable exercise of its regulatory authority, I would affirm the district court's judgment.

## II.

As the panel majority acknowledges, the DOL's authority to implement a new definition of investment-advice fiduciary implicates the two-step

---

[1] This is an important point. The DOL has noted that the "proposed general definition of investment advice was intentionally broad to avoid weaknesses of the 1975 regulation and to reflect the broad sweep of the statutory text." Fiduciary Rule, 81 Fed. Reg. 20,971. Realizing that "standing alone" the new definition "could sweep in some relationships that are not appropriately regarded as fiduciary in nature" and that the DOL did "not believe Congress intended to cover as fiduciary relationships," the DOL created "carve-outs" to exclude specific activities and communications from the definition of fiduciary investment advice. Fiduciary Rule, 81 Fed. Reg. 20,948–49. After receiving comments on that proposal, the DOL eliminated the term "carve-out" from the final regulation and articulated with greater specificity the nature of communications and activities that would be regarded as fiduciary-creating "recommendations" while expressly proscribing conduct and relationships that ERISA was not enacted to prevent. *See* Fiduciary Rule, 81 Fed. Reg. 20,949; 29 C.F.R. § 2510.3–21(b)–(c).

[2] Given the primary basis of the panel majority's holding, their opinion does not address Appellants' First Amendment claims. Because I would uphold the DOL's regulations, I would also reject Appellants' First Amendment claims as either waived or otherwise without merit.

analytical framework established in *Chevron*. "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a *permissible* construction of the statute." *Id.* at 843 (emphasis added). The agency's view "governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (emphasis in original). Importantly, a court may not substitute its own construction of a statutory provision of a reasonable interpretation made by the administrator of an agency. *Chevron*, 467 U.S. at 844.

The *Chevron* inquiry necessarily begins with the text of the statutory definition of investment-advice fiduciary. *See* 29 U.S.C. § 1002(21)(A)(ii); 26 U.S.C. § 4975(e)(3). Contrary to the panel majority's protestation, nothing in the statutory text forecloses the DOL's current interpretation. The statute does not define the pertinent phrase "renders investment advice," and ERISA expressly authorizes the DOL to adopt regulations defining "technical and trade terms used" in the statute. 29 U.S.C. § 1135. As a matter of ordinary usage, there can be no "serious dispute" that someone who provides "[a] recommendation as to the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property," 29 C.F.R. 2510.3–21(a), is "render[ing] investment advice." *See Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 23 (D.D.C. Nov. 4, 2016). Additionally, although the panel

No. 17-10238

majority dismisses the use of dictionary definitions as an aid in interpreting the statutory text, plain language definitions highlight the uniformity between the statutory text and the DOL's regulations.[3] The dictionary defines "advice" as an "opinion or recommendation offered as a guide to action [or] conduct," and it defines "investment" as "the investing of money or capital in order to gain profitable returns." *See Random House Dictionary of the English Language* (2d ed. 1987). The DOL's interpretation of "investment advice" all but replicates those definitions by classifying as fiduciaries only those who provide "recommendations" to investors who reasonably rely on their advice and expertise. *See* 29 C.F.R. § 2510.3–21(a)–(c). Nothing in the phrase "renders investment advice for a fee or other compensation" suggests that the statute applies only in the limited context accepted by the panel majority.

That the text of ERISA does not unambiguously foreclose the DOL's regulatory interpretation of fiduciary satisfies step one of *Chevron*. Nonetheless, the panel majority reaches additional erroneous conclusions to make a case for a contrary holding. The panel majority primarily contends that the DOL's new interpretation is inconsistent with common law fiduciary standards that Congress contemplated and retained in enacting ERISA. Under

---

[3] The panel majority repudiates the use of dictionary definitions based on the Supreme Court's preference for common law understandings under ERISA in *Varity Corp. v. Howe*, 516 U.S. 489 (1996). There, the Supreme Court was analyzing whether an employer's actions fell within the statutory definition of fiduciary, and specifically whether the employer was acting as a plan "administrator" at the time it rendered fraudulent advice related to its employees' retirement plans. *Varity Corp.*, 516 U.S. at 492–95. Because the terms "fiduciary" and specifically trust "administration" were given a legal meaning under the common law, the Court proceeded to assess the employer's actions using standards set under common law trust principles related to plan administration. *Id.* at 502. Here, because the common law does not directly inform what constitutes an "investment-advice fiduciary" under ERISA, the DOL's reliance on dictionary definitions to interpret the term is not inconsistent with or contrary to *Varity Corp.*

those common law standards, fiduciary status turns on the existence of a relationship of trust and confidence between the fiduciary and the client, a relationship that the panel majority maintains never materializes when a financial services professional does not engage in the type of ongoing transactional relationships that plan managers and administrators traditionally do.

No one seriously challenges that the courts have, at times, looked to the common law of trusts in interpreting the nature and scope of fiduciary duties under ERISA. The Supreme Court has "recognize[d] that the [ ] fiduciary duties [found in ERISA] draw much of their content from the common law of trusts," which "governed most benefit plans before ERISA's enactment." *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996). But the Court has "also recognize[d] . . . that trust law does not tell the entire story," and that "ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trust did not offer completely satisfactory protection." *Id.* at 497. Accordingly, the Court concluded that "[i]n some instances, trust law . . . offer[s] only a starting point, after which courts must go on to ask whether, or to what extent, *the language of the statute, its structure, or its purposes* require departure from common-law trust requirements." *Id.* (emphasis added).

One area in which Congress has departed from the common law of trusts is with the statutory definition of "fiduciary." ERISA does not define "fiduciary" "in terms of formal trusteeship, but in *functional* terms of *control and authority over the plan, . . .* thus expanding the universe of persons subject to fiduciary duties . . ." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis added). That is, contrary to the panel majority's interpretation, *Mertens* recognizes that although Congress intended to incorporate the core principles

of fiduciary conduct that were developed in the common law of trusts, Congress modified this approach where appropriate for employee benefit plans, including in defining who qualifies as a fiduciary under ERISA. Indeed, ten years before *Mertens*, a panel of this court recognized that ERISA imposes a duty on a broader class of fiduciaries than did trust law. *See Donovan v. Cunningham*, 716 F.2d 1455, 1464 n.15 (5th Cir. 1983) (noting that "ERISA's modifications of exiting trust law include imposition of duties upon a broader class of fiduciaries") (citing 29 U.S.C. § 1002(21) (1976)). The panel majority now interprets *Mertens* very narrowly, effectively limiting its interpretation of the statutory definition of "fiduciary" to reach only plan managers, administrators, and other comparable roles. Such a holding, however, runs counter to the very clear language in *Mertens*, which interpreted ERISA to define fiduciaries as "not only the persons named as fiduciaries by a benefit plan . . . but also anyone else who exercises discretionary control or authority over the plan's management, administration, or assets." *Mertens*, 508 U.S. at 262. Under the current regime, investment advisers of the sort covered by the new regulatory definition of "investment-advice fiduciary" exercise such control. Because the text of ERISA goes beyond the common law, and because the purpose of the statute does not compel a different result, the textual rendering of "fiduciary" controls and, as explained, does not unambiguously foreclose the DOL's interpretation of "investment-advice fiduciary." *See Varity Corp.*, 516 U.S. at 496–97.[4]

---

[4] Accepting as true that the statutory definition of "investment-advice fiduciary" continues to be informed by the common law, I am not persuaded that the DOL's interpretation conflicts with common law trust principles. Throughout the new regulation, the DOL emphasizes that "ERISA safeguards plan participants by imposing trust law standards of care and undivided loyalty on plan fiduciaries," Fiduciary Rule, 81 Fed. Reg.

No. 17-10238

It is only after invoking common law trust principles that the panel majority turns to the statutory text. Instead of assessing the DOL's regulations based on the plain language of the statute, the panel majority relies on several extra-statutory sources which purportedly shed light on how an investment-advice fiduciary should be defined. In so doing, the panel majority maintains that the relevant provisions in ERISA and the Code contemplated a hard distinction between investment advisers and those who merely sell retirement products, and that the DOL dispensed with this distinction in the new rule by conferring fiduciary status on one-time sellers of products.

As an initial matter, the new rule does not make one a fiduciary for selling a product *without a recommendation* upon which an investor might reasonably rely. *See* Fiduciary Rule, 81 Fed. Reg. 20,984; *see also* 29 C.F.R. § 2510.3–21(b). Thus, "if a retirement investor asked a broker to purchase a . . . security, the broker would not become a fiduciary investment adviser *merely because the broker . . . executed the securities transaction.* Such 'purchase and sales' transactions do not include any investment advice component." *Id.* (emphasis added). That the panel majority's primary concern is expressly addressed by the plain language of the new rule is alone enough to render unavailing any reliance on extra-statutory contemporary understandings of

20946, and proscribed certain communications from the new definition of investment-advice fiduciary to "avoid[] burdening activities that do not implicate relationships of trust." Fiduciary Rule, 81 Fed. Reg. 20,950. Additionally, the DOL found that "[i]n the retail IRA marketplace, growing consumer demand for personalized advice . . . has pushed brokers to offer *comprehensive guidance services* rather than just transactional support." Fiduciary Rule, 81 Fed. Reg. at 20,949 (emphasis added). These references to common law trust principles indicate the DOL's intention to regulate only those relationships in which investors rely on the advice and recommendation of financial professionals when making decisions concerning their retirement plans. Nothing in the regulations explicitly conflict with that standard.

the term "investment advice" as inherently and necessarily distinctive from pure sales activity (which, again, the new rule does not purport to regulate). In any event, the sources cited by the panel majority independently undermine its ultimate conclusion.

The panel majority first highlights the Investment Advisers Act of 1940 ("the IAA"), which precedes the disputed regulations by some 76 years and which informed Congress's use of the phrase "renders investment advice for a fee or other compensation" in ERISA and the Code. The IAA defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities," 15 U.S.C. § 80b–2(a)(11), and specifically excludes from that definition "any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no compensation therefor." *Id*. From this, the panel majority gleans that the distinction in the IAA between "investment advisers compensated for rendering advisory services" and "salespersons compensated only for their sales" was incorporated by Congress into the concepts of ERISA. This logic is misplaced. "The distinction between advisers and brokers contained in the [IAA] was created when Congress define[d] 'investment adviser' broadly and then create[d] . . . a precise exemption for broker-dealers." *Perez*, 217 F. Supp. 3d at 26 (quoting *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 489 (D.C. Cir. 2007)) (internal quotations omitted). In ERISA and the Code, however, Congress omitted such an exclusion from the definition of "fiduciary." *See* 29 U.S.C. § 1002(21)(A); 26 U.S.C. § 4975(e)(3)(B). Thus, to the extent Congress had the IAA in mind as a model when it enacted the statutory definition of

"fiduciary" found in ERISA, that the definitions do not exactly align, and specifically that ERISA's definition mysteriously omits any statutory exclusion of broker-dealers, counsels against construing ERISA's definition of "fiduciary" in the way advanced by the panel majority. *See Perez*, 217 F. Supp. 3d at 26.

Additionally, the panel majority's reliance on the DOL's *original* regulation, SEC interpretations of "investment advice for a fee," and case law tying investment advice for a fee to "ongoing relationships between adviser and client" are similarly unavailing. First, because the DOL limited the scope of its original regulation such that it did not touch the breadth of the statutory definition of fiduciary, all interpretations rendered pursuant to that regulation will necessarily be limited in a way that the new regulation seeks to remedy. Further, that the SEC and case law have interpreted investment advice *for a fee* as implicating ongoing relationships between an adviser and his client does not take the entire statutory provision into consideration. ERISA defines "investment-advice fiduciary" as one who renders investment advice "for a fee *or other compensation*, direct or indirect." 29 U.S.C. § 1002(21)(A)(ii) (emphasis added). This phrase contemplates compensation structures other than those incorporating fees, *i.e.* commissions, and which are built on relationships that are more than mere buyer-seller interactions, but which do not require ongoing intimate relationships.

The panel majority also emphasizes that the investment-advice provision is "bookended" by two separate definitions of fiduciary which purportedly incorporate common law trust principles and apply to individuals vested with responsibilities to manage and control the plan. From this, the panel majority extrapolates that the investment advice prong requires the existence of a "special" relationship so as to harmonize with the statutory

No. 17-10238

definitions of fiduciary that come before and after it. However, that the other two prongs of the statutory definition of "fiduciary" describe those involved in managing or administering a plan provides support for the opposite conclusion. Because the other disjunctive prongs of the statutory definition already address "the ongoing management [and administration] of an ERISA plan," the panel majority's reading of the "investment advice" prong would strip that prong of independent meaning and render it superfluous. *See, e.g., U.S. v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (citation and internal quotation marks omitted).

In sum, the statutory definition of "fiduciary" does not unambiguously foreclose the DOL's updated regulatory definition of "investment-advice fiduciary." The text and structure of the statute support this conclusion, and the panel majority's reliance on common law presumptions and extra-statutory interpretations of "renders investment advice for a fee" do not upset this conclusion. Accordingly, I conclude that the DOL acted well within the confines set by Congress in implementing the challenged regulatory package, and said package should be maintained so long as the agency's interpretation is reasonable.

## III.

In applying *Chevron* step two to cases where an agency has changed its existing policy, the court defers to the agency's permissible interpretation, but only if the agency has offered a reasoned explanation for why it chose that interpretation. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Analysis at this step is analogous to the "arbitrary or capricious" standard under the APA. *See Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011).

No. 17-10238

The DOL's interpretation of "renders investment advice" is reasonably and thoroughly explained. The new interpretation fits comfortably with the purpose of ERISA, which was enacted with "broadly protective purposes" and which "commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *Perez*, 217 F. Supp. 3d at 28 (quoting *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993)). In light of changes in the retirement investment advice market since 1975, mentioned above, the DOL reasonably concluded that limiting fiduciary status to those who render investment advice to a plan or IRA "on a regular basis" risked leaving retirement investors inadequately protected. This is especially so given that "one-time transactions like rollovers will involve trillions of dollars over the next five years and can be among the most significant financial decisions investors will ever make." *Perez*, 217 F. Supp. 3d at 28 (citing Fiduciary Rule, 81 Fed. Reg. at 20,954–55). Given DOL's reasoned explanation for choosing its most recent interpretation, I would hold that the agency's action passes muster under step two of *Chevron*.

Notwithstanding the DOL's reasoned explanation for the new regulations, the panel majority maintains that the DOL acted unreasonably and arbitrarily when it promulgated the new fiduciary rule and, in a strained attempt to justify this conclusion, the panel majority disregards the requirement of showing judicial deference under *Chevron* by highlighting purported issues with other provisions of the regulation. Each of the panel majority's positions fails for reasons more fully explained below.

*A. PTE 84–24, the BIC Exemption, and the DOL's Exemption Authority*

No. 17-10238

Beyond its qualms with the new regulatory delineations on who qualifies as an investment-advice fiduciary, the panel majority takes substantial issue with the DOL's exercise of its exemption authority to amend PTE 84–24 and create the new BIC Exemption. The DOL may supplement statutorily created exemptions by implementing new exemptions under the prohibited transaction rules, which apply to retirement investment instruments under Titles I and II and "supplement[ ] the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by . . . barring certain transactions deemed 'likely to injure the pension plan.'" *Harris Tr. & Sav. Bank*, 530 U.S. at 241–42. ERISA and the Code authorize the DOL to adopt "*conditional or unconditional* exemption[s]" for otherwise prohibited transactions, the only limitation on this expansive authority being that the exemption must be "administratively feasible," "in the interest of the plan and its participants and beneficiaries," and "protective of the rights of [plan] participants and beneficiaries." 29 U.S.C. § 1108(a); 26 U.S.C. § 4975(c)(2). Consistent with this broad authority, the DOL granted exemptions for otherwise prohibited transactions in the new regulatory package, but conditioned those exemptions on, among other things, a requirement that the fiduciary take on the same duties of "prudence" and "loyalty" that bind Title I fiduciaries. *See* Fiduciary Rule, 81 Fed. Reg. 21,077, 21,176. This condition is only truly meaningful as applied to advisers under Title II, which must, under the new rule, satisfy new requirements to engage in transactions that would otherwise be prohibited.

The panel majority concludes that because the DOL is given no direct statutory authority to regulate IRA plan fiduciaries under Title II, and because the DOL has used its exemption authority to "subject most of these newly regulated actors and transactions to a raft of affirmative obligations," the

agency necessarily abused its exemption authority. However, the panel majority's interpretation of the DOL's use of its exemption authority all but ignores the statutory directive given to the DOL to create "conditional or unconditional" exemptions from otherwise prohibited transactions. ERISA and the Code do not qualify the form conditions must take or limit the scope of the DOL's exemption authority to mirror specific exemptions created by Congress, leaving it up to the agency to decide whether to impose affirmative or negative conditions (or none at all) on exemptions from prohibited transactions. And Congress's imposition of broad regulatory power over Title I plans is not dispositive of whether Congress intended to foreclose the DOL from requiring adherence to those duties as a condition of granting an exemption.[5]

Further, the panel majority accepts Appellants' contention that the BIC Exemption creates a private right of action in contravention of *Alexander v. Sandoval*, 532 U.S. 275 (2001) by requiring the inclusion of specific contractual

---

[5] Throughout its opinion, the panel majority represents that the BIC Exemption was created to draw back an otherwise "overinclusive" regulatory definition of investment-advice fiduciary, and that without the BIC Exemption, the new definition could "sweep in some relationships that are not appropriately regarded as fiduciary in nature and that the Department does not believe Congress intended to cover as fiduciary relationships." *See* Maj. Opn. at p. 9 (quoting Fiduciary Rule, 81 Fed. Reg. 20,948); *see also* Maj. Opn. at 35. However, the quoted language upon which the panel majority's opinion relies does not cite the BIC Exemption as the regulatory provision intended to keep the new definition of investment-advice fiduciary in line with the statutory definition of the same, but to certain *exclusions* of communications between advisers and plan beneficiaries within the new regulatory definition of investment-advice fiduciary. Note 1, *supra*, describes how the regulatory definition of investment-advice fiduciary explicitly circumscribes those "relationships that are not appropriately regarded as fiduciary in nature." The BIC Exemption is not the source of this exclusion (which serves to specify who is and who is not an investment-advice fiduciary), but it is the new definition of investment-advice fiduciary itself that limits its own reach. Relatedly, it is illogical to cite the BIC Exemption as creating an external limit on the new definition of fiduciary, as the entire purpose of the exemption is to impose requirements on parties who fall within the new definition of fiduciary (and consequently fall outside the group of advisers who are excluded from the new definition).

terms as a condition of qualifying for and receiving the prohibited transaction exemption. However, the BIC Exemption does not create a private right of action. "[I]t merely dictates terms that otherwise-conflicted financial institutions must include in written contracts with IRA and other [Title II] owners in order to qualify for the exemption." *Perez*, 217 F. Supp. 3d at 36. Any action brought to enforce the terms of the written contract created pursuant to the BIC Exemption would be brought under state law, and state law would ultimately control the enforceability of any of the required contractual terms.

The panel majority also urges that in moving fixed indexed annuities from PTE 84–24 to the BIC Exemption, the DOL failed to account for state regulation of sales of annuities. *See* Maj. Opn. at 41–42 (citing *American Equity Inv. Life Ins. Co. v. S.E.C.*, 613 F.3d 166 (D.C. Cir. 2010)). However, ERISA contains no statutory requirement that the DOL check for efficiency when changing which annuities qualify for a specific exemption, as was the case in *American Equity*. Further, before making the relevant amendments to the exemptions, the DOL comprehensively assessed existing securities regulation for variable annuities, state insurance regulation of all annuities, and consulted with numerous government and industry officials, including the SEC, the Department of the Treasury, and the Consumer Financial Protection Bureau, among others. The DOL found the protections prior to the current rulemaking insufficient to protect investors and acted within its prerogative to modify the regulatory regime as it deemed necessary.

Similarly, the panel majority observes that because § 913(g) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. Law. No. 111 – 203, 124 Stat. 1376 (2010) ("Dodd-Frank Act") prohibits the SEC from adopting a standard of conduct that disallows commissions for broker-dealers, it is

implausible that Congress intended to allow the DOL, through ERISA, to promulgate a regulation that would do just that. As an initial matter, the DOL's final rules do not *prohibit* commissions for broker-dealers. The rules only modify already-existing exemptions from prohibited transactions. As has been the case, if a person or entity qualifies for an exemption, the applicant can still receive commissions and other forms of third party compensation. Further, "[n]othing in the Dodd-Frank Act indicates that Congress intended to preclude the DOL's regulation of fiduciary investment advice under ERISA or its application of such a regulation to securities brokers or dealers." Fiduciary Rule, 81 Fed. Reg. 20,990. In fact, "[the] Dodd-Frank Act specifically directed the SEC to study the effectiveness of existing . . . regulatory standards of care under other federal and state authorities," § 913(b)(1), (c)(1), and "[t]he SEC has . . . consistently recognized ERISA as an applicable authority in this area, noting that advisers entering into performance fee arrangements with employee benefit plans covered by [ERISA] are subject to the fiduciary responsibility and prohibited transaction provisions of ERISA." *Id.* (internal quotation marks omitted).

### B. Questions of Deep "Economic and Political Importance"

Finally, the panel majority's contention that the DOL is using a "long-extant" statute to implement an "enormous and transformative expansion in regulatory authority without clear congressional authorization" is misplaced. Maj. Opn. at 44–45. The panel majority relies on several Supreme Court cases in support of this position but fails to recognize a meaningful distinction between those opinions and the case *sub judice*: in each of these cases, the relevant agency clearly exceeded the scope of delegation created by the enabling statute. *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444

(2014) (holding that "it would be patently unreasonable—not to say outrageous—for [the] EPA to insist on seizing expansive power that *it admits the statute is not designed to grant*," and finding that a "long-extant statute [did not give EPA] an unheralded power to regulate a significant portion of the American economy") (emphasis added); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–160 (2000) (rendering as invalid regulations in which the FDA departed from statements it had made to Congress for over ninety years that it did not have jurisdiction over the tobacco industry, and ignoring that Congress had created a distinct regulatory scheme over the tobacco industry and expressly rejected proposals to give the FDA such jurisdiction). Here, in contrast, the DOL has acted within its delegated authority to regulate financial service providers in the retirement investment industry—which it has done since ERISA was enacted—and has utilized its broad exemption authority to create conditional exemptions on new investment-advice fiduciaries. That the DOL has extended its regulatory reach to cover more investment-advice fiduciaries and to impose additional conditions on conflicted transactions neither requires nor lends to the panel majority's conclusion that it has acted contrary to Congress's directive.

## IV.

The panel majority's conclusion that the DOL exceeded its regulatory authority by implementing the regulatory package that included a new definition of investment-advice fiduciary and both modified and created new exemptions to prohibited transactions is premised on an erroneous interpretation of the grant of authority given by Congress under ERISA and the Code. I would hold that the DOL acted well within its regulatory authority—as outlined by ERISA and the Code—in expanding the regulatory

definition of investment-advice fiduciary to the limits contemplated by the statute, and would uphold the DOL's implementation of the new rules.